In re AMERICAN STATES PUBLIC SERV-
ICE CO.*
No. 7851.

District Court, D. Maryland.
Nov. 7, 1935.

*Decree modified, Burco v. Whitworth, — F.(2d) —.

Piper, Carey & Hall, of Baltimore, Md. (by James Piper and Huntington Cairns, both of Baltimore, Md.), for trustees of American States Public Service Co., debtor.

Davis, Polk, Wardwell, Gardner & Reed, of New York City (by John W. Davis, of New York City), for Ferd Lautenbach.

Ralph P. Buell, of New York City, for Burco, Inc.

John J. Burns, of Washington, D. C., for Securities and Exchange Commission.

Thomas G. Corcoran and Benjamin V. Cohen, Sp. Assts. to U. S. Atty. Gen., and Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, both of Baltimore, Md., for the United States.

Semmes, Bowen & Semmes, of Baltimore, Md. (by Frederick W. Brune and W. Randall Compton, both of Baltimore, Md.), and Humes, Buck, Smith & Stowell, of New York City (by Albridge C. Smith, of New York City), for R. Emerson Swart and First Lien Bondholders' Protective Committee.

Carlyle Barton and H. Warren Buckler, Jr., both of Baltimore, Md., for reorganization managers.

Seymour O'Brien, of Baltimore, Md., for Central Republic Trust Co. of Chicago, trustee for all of the outstanding bonds.

Marbury, Gosnell & Williams, of Baltimore, Md. (by William L. Rawls, of Baltimore, Md.), for the debtor.

WILLIAM C. COLEMAN, District Judge.

In the present case, trustees, appointed by this court for the American States Public Service Company, a Delaware corporation having its principal place of business in Baltimore, and being under the jurisdiction of this court by virtue of reorganization proceedings brought pursuant to section 77B of the Bankruptcy Act as amended (11 U.S. Code, § 207 [11 U.S.C.A. § 207]), have petitioned this court for instructions as to their further duties in these proceedings, in view of the enactment of the "Public Utility Act of 1935" (Public, No. 333, 74th Con-

gress, approved August 26, 1935, title 1 [15 U.S.C.A. §§ 79, 79a, et seq.]) ; and, specifically, as to whether that act is valid, and if so, whether they are subject to its provisions.

### PROCEDURAL FACTS AND PLEADINGS.

On June 8, 1934, the debtor corporation filed its original petition, which, on June 19, 1934, was approved, and on July 2, 1934, temporary trustees were appointed for the estate of the debtor. On July 21, 1934, their appointment was made permanent, and it is they who have filed the petition now before this court.

On August 25, 1934, the debtor filed a plan of reorganization which did not affect the debtor's First Lien bondholders, but shortly thereafter, with leave of this court, this plan was withdrawn because found not feasible. On June 10, 1935, the debtor filed another plan of reorganization to which an amendment was filed on July 19, 1935. On that latter date this court approved the selection of reorganization managers for the purpose of supervising the deposit of securities of the debtor, the solicitation of acceptances, and the carrying out of the plan of reorganization, and directed the trustees to advance money not in excess of a total of $5,000 to defray the expenses of the reorganization managers in the performance of their duties. The court also approved, subject to confirmation of the plan of reorganization proposed by the debtor, payments out of the trust estate to dealers for expenses and compensation in connection with the solicitation of deposits and acceptances under the plan. Pursuant to an order of this court made on the same day, notice was given of a hearing of creditors and stockholders to be held on September 20, 1935, to consider the debtor's plan for confirmation or modification. On August 15, 1935, a committee, representing at least 25 per cent. of the First Lien bonds outstanding, filed a plan of reorganization known as the "Swart Plan." That plan was approved by this court as properly filed and also was scheduled for consideration at the hearing on September 20, 1935, by order of this court dated August 19, 1935. However, on September 16, 1935, the trustees filed the petition which gives rise to the present proceeding, asking to be instructed and directed as to their duties in the handling, management, and conservation of the property of the debtor intrusted to their care; and particularly whether they should continue to disburse money in furtherance of the pending plan of reorganization, or should register as a holding company under the Public Utility Act of 1935, title 1, and otherwise comply with the provisions of that law. The petition of the trustees states that they are advised by their counsel (appointed by this court) that this act is unconstitutional.

The petition further alleges that if the act is constitutional, the trustees, as a "holding company" within the meaning of the term "holding company" as defined in the act, will be required to register with the Securities and Exchange Commission not later than December 1, 1935, and thereby commit the estate to the expenditure of a substantial sum of money in preparing and filing, within a reasonable time thereafter, a registration statement; that, accordingly, if the act is constitutional the trustees should cause to be prepared promptly, at the expense of the estate, such data as are required to be included in such registration statement; but that if, on the other hand, the act is unconstitutional, preparation of such data will constitute a waste of assets of the estate in a substantial amount; that a situation of even more immediate importance, however, arises out of the fact that if the act is constitutional, neither of the plans of reorganization that have been filed, nor any other feasible plan of reorganization of the debtor, can be consummated on account of the prohibitions contained in the act, and that any expenditures such as the court has heretofore authorized and directed to be made, looking to the consummation of a plan of reorganization, will constitute a waste of assets of the estate; further, that if the act is constitutional and the trustees fail to register on or before December 1, 1935, and if they or any of their subsidiary companies continue to engage in any of the activities forbidden by the act, they become subject to imprisonment as well as to a very heavy fine or fines, as great as two years' imprisonment or $10,000 fine, or both; that if the two other holding companies, which are subsidiaries of the debtor corporation, should likewise fail to comply with the act, they become subject to a fine as great as $200,000; that, on the other hand, if the act is unconstitutional, the trustees should not go to the expense entailed by registration and by the subsequent preparation and filing with the commission of the elaborate statements required by the act to be filed, but should continue to make expenditures as authorized and directed by this court,

looking to the consummation of a plan of reorganization.

Because of the filing of this petition by the trustees, this court adjourned the hearing on the plans of reorganization, in order that it might first hear and determine the questions presented by the petition, they clearly raising the question as to the application of the Public Utility Act of 1935, title 1. to the rights, duties, and obligations of the trustees in the present proceeding, since both of the plans of reorganization that are before the court contemplate the continued existence of a holding company (the debtor or a reorganized company) which will continue to hold more than 10 per cent. of the outstanding voting securities of various public utility companies, organized and operating in states other than that where the holding company would be organized or would operate; both contemplate the issuance of new securities not confined to a single class of common stock and bonds secured by a first lien upon physical property; neither restricts the operations of the holding company system as reorganized to a single inter-connected and co-ordinated system confined in its operations to a single area or region, in one or more states; and neither proposes that the plan shall be approved by the Securities and Exchange Commission prior to its submission to this court—all of which things, as will hereinafter be shown, being covered by the act.

On September 16, 1935, Burco, Inc., an investment corporation organized under the laws of Delaware, the owner and holder of $150,000 principal amount of First Lien 5½ per cent. Gold bonds, Series A, of the debtor corporation, filed a petition for leave to intervene, asserting that the Public Utility Act of 1935 should be treated as constitutional and in full force and effect; that it (Burco, Inc.), as well as other creditors of the debtor corporation, will be greatly damaged and the assets available for payment of their claims will be wasted unless some plan of reorganization is accepted within a reasonable time or the estate of the debtor corporation is liquidated by order of this court; and, further, that unless the trustees are directed to register under the Public Utility Act of 1935, title 1, as a holding company, it will be impossible to progress a plan of reorganization of the debtor corporation or to have the same accepted and confirmed, or failing acceptance, to have the estate of the debtor corporation liquidated, inasmuch as the progress, acceptance, and confirma-

tion of any plan of reorganization or the liquidation of the estate failing the acceptance of such a plan will require the doing of acts which are forbidden by the Public Utility Act of 1935, unless the debtor corporation is a holding company and registered in accordance with the provisions of that act.

On the same day Ferd Lautenbach, the owner of $2,500 principal amount of Ten-Year 6 per cent. Gold debentures, Series A, of the debtor corporation, also filed a petition asking leave to intervene, claiming that the Public Utility Act of 1935 is unconstitutional for various reasons enumerated in the petition which, accordingly, prays that this act be so held by this court; that the trustees be directed not to register thereunder with the Securities and Exchange Commission, or to expend any money of the estate of the American States Public Service Company in so doing; but that they be directed to continue the advancement of money in furtherance of a plan for the reorganization of the debtor in accordance with the decrees and orders hereinbefore passed by this court.

Both of these parties were allowed to intervene, and this court ordered, on September 16, 1935, that the matter be set down for hearing on September 27, 1935, upon giving due notice of such hearing to the Securities and Exchange Commission, Washington, D. C.; to the United States Attorney for the District of Maryland, at Baltimore; to counsel for the reorganization managers under the debtor corporation's plan of reorganization; and to counsel for the Bondholders' Protective Committee which had intervened in these proceedings, otherwise known as the Swart Committee.

The debtor corporation filed an answer, duly verified, to the trustees' petition, admitting its material allegations and narrating additional facts as to the debtor corporation's organization, status, and relation to its various subsidiaries, as well as the facts concerning their organization and activities. At the hearing, counsel for the government and for the Securities and Exchange Commission appeared, declined to ask leave to intervene, but did ask for leave to be heard as amici curiæ, which was granted.

Counsel for the reorganization managers, appointed by the court pursuant to the provisions of section 77B of the Bankruptcy Act (11 USCA § 207), appeared at the hear-

ing and stated that these managers felt, because of their position as quasi officers of the court, they should take no action or part in these proceedings unless directed by the court so to do, but should continue their efforts to bring to the attention of the security holders the plan of reorganization that had been filed by the debtor; reserving, however, the right to alter their position should they later deem it desirable to take some part in the proceedings, in behalf of the security holders whom they represent. Similarly, counsel for the so-called Swart Committee, representing more than 25 per cent. of the First Lien bondholders of the debtor corporation, appeared at the hearing; stated that, in the opinion of that committee, if the Public Utility Act of 1935, title 1, is constitutional, under its provisions that committee's plan of reorganization for the debtor corporation could not validly be approved or confirmed, leaving therefore liquidation as the only alternative under that act; but further stated that the Swart Committee was not yet prepared to take any definite stand in the present proceedings with respect to the Public Utility Act of 1935, title 1, and that, therefore, the committee desired merely to reserve the right to submit a brief, if prior to the expiration of such time limit as the court might fix for filing briefs, the committee might consider that it was its duty to take a definite position on the issue of the statute's constitutionality. This court thereupon granted permission to both committees to intervene later, or to file briefs, should they so desire. As a result, on October 18, 1935, the reorganization managers filed a petition stating it to be their unanimous conclusion that it is of the first importance to the security holders of the debtor corporation that an early determination be had of the question of the validity of the Public Utility Act, title 1, and therefore they petitioned the court to act in the matter; alleging further, in their petition, that they have received acceptances of the debtor's plan of reorganization from approximately 39 per cent. (or $2,954,000 aggregate face amount) of the holders of the debtor's First Lien 5½ per cent. bonds; and acceptances from approximately 48 per cent. (or $1,579,700 aggregate face amount) of the holders of the debtor's Ten-Year 6 per cent. Convertible debentures; that, in their opinion, as advised by their counsel, if the Public Utility Act, title 1, is constitutional, the only alternative of the trustees of the debtor is to proceed with liquidation; and that either immediate liquidation or enforced liquida-

tion at a predetermined time is against the best interests of all classes of security holders. The so-called Swart Committee has taken no further action in these proceedings.

### THE FACTS.

The following facts as to the debtor corporation and its subsidiaries are material to the questions here raised and are uncontradicted:

The debtor corporation was incorporated under the laws of the state of Delaware in 1928, with its principal place of business in Baltimore, Md. From time to time between the date of its incorporation and the filing of the original petition in these proceedings, it acquired securities of various water and electric companies. Its business is, and has always been solely, that of a holding company owning securities in various public utility companies. It has outstanding in the hands of the public throughout the United States $7,575,400 principal amount of its own First Lien 5½ per cent. Gold bonds, Series A, due May 1, 1948; $3,328,700 principal amount of its own Ten-Year 6 per cent. Gold debentures, Series A, due September 1, 1948; 16,622 shares of $6 cumulative preferred stock; and 100,578 shares of class A stock, and 99,729 shares of class B stock—all of these shares being without nominal or par value. All or substantially all the First Lien bonds and debentures of the debtor were distributed or made the subject of public offerings by use of the mails or means or instrumentalities of interstate commerce subsequent to January 1, 1925. On October 1, 1935, a substantial part of the First Lien bonds and debentures of the debtor so distributed or made the subject of public offerings was owned or held by persons residing in various states.

The trustees of the debtor corporation, by virtue of their appointment by this court, and their having qualified as such, own, control, or hold with power to vote, all the outstanding voting securities of the following eight companies, as well as the other securities hereinafter referred to, of these various companies:

I. American States Electric Company, a Delaware corporation, the capitalization of which consists of 10,000 shares without nominal or par value of voting stock and $427,187.13 principal amount of notes. This company in turn owns, controls, or holds the following outstanding securities of the following companies:

(1) Edison Sault Electric Company, a Michigan corporation, the capitalization of which consists of 20,000 shares without nominal or par value of voting stock and $500,000 principal amount of mortgage notes (all owned by American States Electric Company), and $96,500 principal amount of notes, all owned by the trustees. This company supplies electricity to the public in Chippewa and Mackinac counties, Mich., and sells electricity at wholesale at Manistique, Schoolcraft county, Mich. All the electricity sold by this company is distributed by it in Michigan, and also generated by it in Michigan, except occasional amounts purchased in Sault Ste. Marie, Mich., under a reciprocal breakdown arrangement with Michigan Northern Power Company. This company also supplies water and sewerage service in Mackinac county, Mich.

(2) Dearborn-Ripley Light & Power Company, an Indiana corporation, the capitalization of which is $10,000 par value of voting stock (all owned by American States Electric Company), and $66,400 principal amount of notes, all owned by the trustees. This company supplies electricity to the public in Ripley and Dearborn counties, Ind. It purchases part of its electricity at its transformer at Greendale, Ind., from the city of Greendale, Ind., and part at its transformer at Aurora, Ind., from Public Service Company of Indiana. All the electricity sold by it is purchased by it in Indiana and distributed in Indiana.

(3) Hydro Power Company, an Illinois corporation, the capitalization of which is $98,000 par value of voting stock (all owned by American States Electric Company), and $103,600 principal amount of notes, all owned by the trustees. This company in turn owns, controls, or holds the following outstanding securities of:

Grimes Pass Power Company, an Idaho corporation, the capitalization of which is $60,000 par value of voting stock (all owned by Hydro Power Company), and $54,160.-83 principal amount of notes, all owned by the trustees. This company supplies electricity to the public in Boise county, Idaho. All the electricity sold by this company is generated by it in Idaho and distributed in Idaho.

(4) Hermiston Light & Power Company, an Oregon corporation, the capitalization of which is $10,000 par value of voting stock and $25,000 principal amount of notes (all owned by American States Electric Company), and $55,000 principal amount of notes, all owned by the trustees. This company supplies electricity to the public in Umatilla county, Or. It generates approximately 70 per cent. of its electricity at its own plant in Oregon and purchases the balance at its transformer located in Hermiston, Umatilla county, Or., from Pacific Light & Power Company. All the electricity sold by this company is generated by it in Oregon or purchased by it in Oregon and distributed in Oregon.

II. St. Ignace Public Service Company, a Michigan corporation, the capitalization of which is 1,000 shares without nominal or par value of voting stock and $100,000 principal amount of notes (all owned by the trustees), and $66,000 principal amount of mortgage notes in the hands of the public. This company owns electric and water distribution systems for the distribution of electricity and water to the public in Mackinac county, Mich. The systems of this company are leased to and operated by Edison Sault Electric Company.

III. Upper Peninsula Power Company, a Michigan corporation, the capitalization of which is 20,000 shares without nominal or par value of voting stock (all owned by the trustees), and $5,800 principal amount of notes, all owned by Edison Sault Electric Company, $178,900 principal amount of mortgage notes and $114,600 principal amount of notes in the hands of the public. This company owns a system for the transmission of electricity in Chippewa, Mackinac, and Schoolcraft counties, Mich. The system of this company is leased to and operated by Edison Sault Electric Company.

IV. Plains Light & Water Company, a Montana corporation, the capitalization of which is $25,000 par value of voting stock and $24,000 principal amount of notes (all owned by the trustees), and $8,000 principal amount of mortgage notes in the hands of the public. This company supplies electricity and water to the public in Sanders county, Mont. It has generating facilities but purchases all its electricity at its transformer at Plains, Mont., from Montana Power Company. All electricity sold by it is purchased by it in Montana and distributed in Montana.

V. Rathdrum Electric Company, Limited, an Idaho corporation, the capitalization of which is $10,000 par value of voting stock and $32,000 principal amount of notes (all owned by the trustees), and $8,000 principal amount of mortgage notes in the

hands of the public. This company supplies electricity to the public in Kootenai county, Idaho. It purchases all its electricity at Post Falls, Idaho, from Washington Water Power Company. All electricity sold by it is purchased by it in Idaho and distributed in Idaho.

VI. Bear Valley Utility Company, a California corporation, the capitalization of which is $100,000 par value of voting stock, and $270,500 principal amount of notes (all held by the trustees). This company supplies electricity and water to the public in the community of Bear Valley, Cal. It purchases all its electricity at its transformer at Bear Valley, Cal., from Sierra Nevada Power Company. All the electricity sold by this company is purchased by it in California and distributed in California.

VII. American States Water Service Company of California, a California corporation, the capitalization of which is $1,373,300 par value of voting stock, and $3,013,728 principal amount of notes (all owned by the trustees). This company supplies water to the public in California, principally within and adjacent to the city of Los Angeles.

VIII. Kellogg Power & Water Company, an Idaho corporation, the capitalization of which is $65,000 par value of voting stock, and $92,997 principal amount of a note (all owned by the trustees). This company supplies water to the public in Shoshone county, Idaho.

The facilities of every one of the above companies are situated entirely within the boundaries of a single state, which in each case is the state of incorporation. None of them transmits or distributes electric energy other than electric energy generated or purchased by it in such state, and none of them transmits or sells any electric energy outside of the boundaries of such state; similarly, none of them obtains or supplies water, or conducts any sewerage business, outside of the boundaries of such state. None of them is engaged in any business other than the electric business or the electric, water, and sewerage business.

It will be seen that one of the eight subsidiaries of the debtor corporation is itself merely a holding company, to wit, American States Electric Company, which owns and controls a subsidiary which, in turn, is also a holding company, to wit, Hydro Power Company. Neither of these "junior" holding companies itself generates, purchases, transmits, or distributes any electric power, nor is it engaged in any other business whatsoever except that of a holding company. Two of the remaining seven subsidiaries of the debtor corporation are solely electric power companies, two of them are solely water companies, and the remaining three are both electric power and water companies.

Approximately 66 per cent. of the consolidated operating and nonoperating revenues of the trustees of the debtor corporation for the year ended July 31, 1935, accrued from the water business, and approximately 34 per cent. thereof from the electric business, conducted by the various subsidiary companies. Of the income received by the trustees for the six months ended June 30, 1935, approximately 70 per cent. was derived from subsidiary water companies, and approximately 30 per cent. from subsidiary electric companies.

### THE JURISDICTIONAL QUESTIONS.

At the hearing and in their briefs, counsel for the government, as well as counsel for the Securities and Exchange Commission, stressed the five following points: (1) That this court has no jurisdiction to determine the constitutionality of the Public Utility Act of 1935, title 1, in the present proceeding, because the petitions herein disclose no justiciable case or controversy between any of the petitioners as truly adverse litigants; (2) that even if the petitions are deemed to disclose such a justiciable controversy, this proceeding is premature because any such purported controversy is not immediate, and the proceeding does not present to the court the infringement or threatened infringement of any direct and immediate right of any party to such controversy; (3) that even if the petitions are deemed to disclose such a justiciable controversy, this court should not assume jurisdiction of such controversy because the record discloses that this proceeding is collusive; (4) that if the Public Utility Act of 1935, title 1, threatens any direct or immediate right of the trustees or the creditors in this proceeding, the proper proceeding is for the trustees to seek authorization from the court to take only such action as the debtor itself might have taken in defense of the debtor's rights prior to this proceeding; and (5) that since Congress, under its bankruptcy power and its power to constitute federal tribunals inferior to the Supreme Court, has the authority to regulate the practice and procedure to be followed in such courts and by trustees ap-

pointed by them, and since Congress in the Public Utility Act, title 1, has regulated the practice and procedure regarding the administration of utility-holding company estates in bankruptcy in these courts, neither the trustees nor the creditors they represent have such an interest as permits them to question the act, even assuming the act might infringe upon the constitutional rights of other persons, not parties to this proceeding, and that the provisions of the act are not separable in their relation to bankruptcy proceedings.

■■■ The fourth one of these arguments is too fictitious to warrant more than slight notice. It is, in effect, that if the trustees of the debtor corporation believe that any constitutional right of themselves or their beneficiaries is threatened, the proper procedure is for them to request the court to authorize them to contest the act in such manner and in such proceedings as the act might be contested by a holding company not in bankruptcy. This argument is seemingly based upon two misconceptions of the law, starting with the theory—equally untenable—that this proceeding is in substance a summary proceeding against the government which is not a party to this proceeding. These two misconceptions of the law are: (1) That the government is, in effect, an indispensable party to any proceeding in which the constitutionality of an act of Congress may be in issue; and (2) that it is not the right, much less the duty, of equity trustees—for such are the present trustees by virtue of the express provisions of section 77B of the Bankruptcy Act under which they have been appointed and are acting— to ask instructions from the court concerning the administration of the property in their hands. On the first point, we need merely mention that our constitutional law from the founding of the nation to the present time is replete with decisions of the Supreme Court, some of them of far-reaching importance, declaring acts of Congress unconstitutional in suits to which the government was neither a party, nor appeared even as amicus curiæ [see, among the more recent cases, Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106; Washington v. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646.; Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145; Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; Butts v. M. & M. Transportation Co., 230 U.S. 126, 33 S.Ct. 964, 57 L.Ed. 1422;

Coyle v. Smith, Sec. of State of Oklahoma, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853]; and where the government appeared only as amicus curiæ [see, for example, First Employers' Liability Cases, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297; Second Employers' Liability Cases, 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A. (N.S.) 44; Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759; Hepburn v. Griswold, 8 Wall. (75 U.S.) 603, 19 L. Ed. 513; Ex parte Garland, 4 Wall. (71 U. S.) 333, 18 L.Ed. 366]. It is, of course, recognized that in many such instances the interest of the government was not as direct as here. But in others, it was even more so, as for example in the Pollock Case, supra, involving the validity of the Federal Income Tax Law. The same principle applies to all. As to the second point, citation of authorities to refute it would be equally superfluous. Trustees would be derelict in their duties if they did not seek instructions when in doubt upon any question materially relating to, or appearing to materially relate to, the performance of their duties. A trustee's bill for instructions is the traditional form of procedure. Nashville, Chattanooga & St. Louis R. Co. v. Wallace, 288 U.S. 249, 263, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191; Fidelity National Bank v. Swope, 274 U.S. 123, 132, 47 S.Ct. 511, 71 L.Ed. 959. See, also, United States v. Bankers' Trust Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352, and Continental Illinois Nat. Bank v. Chicago, Rock Island R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110. The same is true with respect to the reorganization managers who, on behalf of a very large portion of the security holders of the debtor corporation, have followed the trustees in requesting the court to make a prompt determination of the question as to the act's validity.

The first three arguments of the government also strike directly at the jurisdiction of this court to entertain the present proceeding. Two of them, namely, the first and third, may be treated together because in substance one and the same, in that they charge collusion by the various parties to the proceeding in the legal sense that here is a suit in which there is really no adverse interest—that it is a friendly and arranged suit. In answer to this argument, it is sufficient to refer to the prayers of the petition of Burco, Inc., which have already been referred to, which, summarized, are to the effect that that company as holder of $150,-000 of the debtor corporation's First Lien

bonds, does in fact believe (1) that the debtor corporation should be liquidated, and (2) that the Public Utility Act of 1935, title 1, is constitutional, and (3) that by its provisions, the debtor corporation is, and should be compelled to liquidate; after registering with the Securities and Exchange Commission and doing the other things required by that act.

■ The regularity of this petition of Burco, Inc., duly signed and sworn to by an officer of the corporation (whose authority to act by and for the corporation stands unassailed), supported by the testimony of the company's counsel, Mr. Buell, at the hearing, leaves no ground for asserting that there is a lack of truly adverse interests. It is difficult to see how the interests of the trustees and of this large creditor of the debtor corporation, to wit, Burco, Inc., could be more truly adverse, unless we are to reject arbitrarily the petition of Burco, Inc., as being utterly false and fraudulent in conception and in execution, and unless we are likewise to assume the supporting testimony of Mr. Buell to be perjured—things which this court has no ground for doing—because totally without warrant on the pleadings and the evidence. In short, this court finds without hestitation that there are parties truly adverse in this proceeding, who, if not otherwise barred, are entitled to have their opposing claims judicially decided. The proceedings for the reorganization of the debtor under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, constitute the "case" required by article 3, § 2 of the Constitution. Furthermore, a federal court which has jurisdiction of a proceeding also has jurisdiction of another proceeding which is a continuation of, or ancillary to, the first proceeding, although it might not have jurisdiction of the second one, if it were an original action. See Public Utilities Commission v. Landon, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577; Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230, 93 A.L.R. 195. It is not forbidden "collusion" for the parties to a case, by agreement, to put it in such shape that the rights and obligations of the parties can be the more readily determined by the court, especially when matters of public moment are involved, requiring speedy settlement, regardless of an adverse effect upon the government's interests. See Freuler v. Helvering, 291 U.S. 35, 54 S.Ct. 308, 78 L.Ed. 634. What has just been said applies equally to the status of the other intervening petitioner, Ferd Lautenbach, and

his counsel. The attempt on the part of counsel for the government and for the Securities and Exchange Commission to disparage the motives of both interveners and their counsel is not only baseless, but unworthy of any representative of any branch of our government, and an unwarranted reflection upon the trustees, officers of this court, appointed in this proceeding.

This brings us to a consideration of the second jurisdictional question raised by the government and the Securities and Exchange Commission, namely, whether, even if this proceeding does disclose a controversy between adverse litigants, this proceeding is nevertheless premature, because any such controversy is not immediate and there is not presented to the court the infringement or threatened infringement of any direct and immediate right of any party to such controversy.

A correct answer to this argument can only be given after an analysis and understanding of the Public Utility Act of 1935, and of what it purports to accomplish. We therefore pass now to a consideration of its provisions.

### ANALYSIS OF THE ACT.

The act is entitled an act "to provide for control and regulation of public-utility holding companies, and for other purposes." It is divided into two titles, which, in practical effect, constitute separate acts. Title 1 is headed "Control of Public-Utility Holding Companies," and embraces thirty-three sections, thirty-nine pages in length. Title 2 is headed "Amendments to Federal Water Power Act," and is divided into three parts. The first part bears no separate heading, but part 2 is entitled "Regulation of Electric Utility Companies Engaged in Interstate Commerce," and part 3 is entitled "Licensees and Public Utilities; Procedural and Administrative Provisions." Title 2 comprises, in all, forty-two sections, covering twenty-eight pages.

The provisions of title 1 (15 U.S.C.A. §§ 79, 79a et seq.) are applicable to holding companies having electrical or retail gas subsidiaries; also to subsidiary companies of such holding companies, and to "affiliates" of all such companies; to "mutual service companies" and to persons whose principal business is the performance of service, sales, or construction contracts with such holding companies or such public utility companies. Administration of title 1 is vested in the Securities and Exchange Commission.

The provisions of title 2 (16 U.S.C.A. §§ 791a, 796 et seq.) apply to companies owning or operating facilities for the transmission of electrical energy, or for the sale thereof at wholesale in interstate commerce or (to the extent specifically provided in the title) for the generation of energy for such transmission or sale, and to water power licensees. Administration of title 2 is vested in the Federal Power Commission. By express provision in title 2 (section 318 [16 U.S.C.A. § 825q]), if any individual or company is subject to any requirements of title 1, as well as to any requirements under title 2, the requirements of title 1 shall alone prevail, unless the Securities and Exchange Commission has granted an exemption from such requirements, in which event the requirements of title 2 only shall apply. By virtue of this provision and the particular facts, we are not concerned in this proceeding with title 2.

While the thirty-three sections of title 1 are grouped under a large number, the short title of which is the "Public Utility Holding Company Act of 1935," and variety of subheadings, all of the sections may, for convenience and greater clarity, be classified into seven major divisions, as follows:

1. Declaration of Purpose or Policy of the Act (section 1, 15 U.S.C.A. § 79a);

2. Definitions (section 2, 15 U.S.C.A. § 79b);

3. Exemptions (section 3, 15 U.S.C.A. § 79c);

4. Regulation of Unregistered Holding Companies (section 4, 15 U.S.C.A. § 79d);

5. Registration and Regulation of Holding Companies and their Subsidiaries (sections 5–15, inclusive, 15 U.S.C.A. §§ 79e to 79o);

6. Enforcement, both Civil and Criminal (sections 16–29, inclusive, 15 U.S.C.A. §§ 79p to 79z—3); and

7. Miscellaneous (section 30, 15 U.S.C.A. § 79z—4, studies and surveys by the commission; section 31, 15 U.S.C.A. § 79z—5, employees of the commission; section 32, 15 U.S.C.A. § 79z—6, separability of the act's provisions; and section 33, 15 U.S.C.A. § 79, short title of the act).

Taking up these seven major divisions of the act in their order, we will now analyze the first four more critically. Division 1, covering the purpose or policy of the act, must be read as a whole, in order to be fully comprehended. It is as follows:

"Section 1. (a) Public-utility holding companies and their subsidiary companies are affected with a national public interest in that, among other things, (1) their securities are widely marketed and distributed by means of the mails and instrumentalities of interstate commerce and are sold to a large number of investors in different States; (2) their service, sales, construction, and other contracts and arrangements are often made and performed by means of the mails and instrumentalities of interstate commerce; (3) their subsidiary public-utility companies often sell and transport gas and electric energy by the use of means and instrumentalities of interstate commerce; (4) their practices in respect of and control over subsidiary companies often materially affect the interstate commerce in which those companies engage; (5) their activities extending over many States are not susceptible of effective control by any State and make difficult, if not impossible, effective State regulation of public-utility companies.

"(b) Upon the basis of facts disclosed by the reports of the Federal Trade Commission made pursuant to S.Res. 83 (Seventieth Congress, first session), the reports of the Committee on Interstate and Foreign Commerce, House of Representatives, made pursuant to H.Res. 59 (Seventy-second Congress, first session) and H.J.Res. 572 (Seventy-second Congress, second session) and otherwise disclosed and ascertained, it is hereby declared that the national public interest, the interest of investors in the securities of holding companies and their subsidiary companies and affiliates, and the interest of consumers of electric energy and natural and manufactured gas, are or may be adversely affected—

"(1) when such investors cannot obtain the information necessary to appraise the financial position or earning power of the issuers, because of the absence of uniform standard accounts; when such securities are issued without the approval or consent of the States having jurisdiction over subsidiary public-utility companies; when such securities are issued upon the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacity of the properties and upon the basis of paper profits from intercompany transactions, or in anticipation of excessive revenues from subsidiary public-utility companies; when such securities are issued by a subsidiary public-utility company under circumstances which subject such company

to the burden of supporting an overcapitalized structure and tend to prevent voluntary rate reductions;

"(2) when subsidiary public-utility companies are subjected to excessive charges for services, construction work, equipment, and materials, or enter into transactions in which evils result from an absence of arm's-length bargaining or from restraint of free and independent competition; when service, management, construction, and other contracts involve the allocation of charges among subsidiary public-utility companies in different States so as to present problems of regulation which cannot be dealt with effectively by the States;

"(3) when control of subsidiary public-utility companies affects the accounting practices and rate, dividend, and other policies of such companies so as to complicate and obstruct State regulation of such companies, or when control of such companies is exerted through disproportionately small investment;

"(4) when the growth and extension of holding companies bears no relation to economy of management and operation or the integration and coordination of related operating properties; or

"(5) when in any other respect there is lack of economy of management and operation of public-utility companies or lack of efficiency and adequacy of service rendered by such companies, or lack of effective public regulation, or lack of economies in the raising of capital.

"(c) When abuses of the character above enumerated become persistent and wide-spread the holding company becomes an agency which, unless regulated, is injurious to investors, consumers, and the general public; and it is hereby declared to be the policy of this title, in accordance with which policy all the provisions of this title shall be interpreted, to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce; and for the purpose of effectuating such policy to compel the simplification of public-utility holding-company systems and the elimination therefrom of properties detrimental to the proper functioning of such systems, and to provide as soon as practicable for the elimination of public-utility holding companies except as otherwise expressly provided in this title." (15 U.S. C.A. § 79a.)

While by no means entirely clear, because of the sweeping character of this declaration of policy, we interpret it as saying, first, that public utility holding companies and their subsidiaries, *generally,* without regard to whether they do in fact and in law engage in interstate commerce, are "affected with a national public interest"; and, second, that therefore certain enumerated evils of which *all* public utility holding companies and their subsidiaries, taken as a whole, have been found by the Congress to be guilty, must be eliminated on the assumption of the Congress, *whether it be a fact or not,* that these enumerated evils are so "connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce," in the legal or constitutional sense as to give the Congress power to legislate with respect to these enumerated evils. That such interpretation is required, follows necessarily from the language employed in the enumeration of the five different classes of abuses or evils which it is the declared policy of the act to regulate or to eliminate, for in not a single one of these different classes is "interstate commerce" alluded to, much less made the criterion for the exertion of the congressional power. We are not unmindful of the direct reference to the mails and instrumentalities of interstate commerce in subsection (a) (1 to 4), of section 1, 15 U.S.C.A. § 79a (a) (1–4); but while the right to exert the congressional power may have been intended to be predicated upon the mere use of the mails and instrumentalities of interstate commerce for the distribution of the securities of holding companies and their subsidiaries (section 1 (a) (1)—a question which will be dealt with later—the wording of subsection (a) is obviously too broad, when taken in its entirety, to permit of such a narrowing down. Note the use of the word "often" in subsection (a) (2), (3), and (4).

Nor have we lost sight of the fact that interstate commerce is once more—but only once more—referred to, that is, in subsection (c), the closing paragraph of section 1, where we find this declaration: "It is hereby declared to be the policy of this title, in accordance with which policy all the provisions of this title shall be interpreted, to meet the problems and eliminate the evils

as enumerated in this section, *connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce.*" (Italics inserted.) This declaration, it must be noted, is not confined to the regulation of the interstate commerce activities of holding companies, or of their activities which directly affect or burden interstate commerce, but covers various previously enumerated "problems" and "evils" *"connected"* with such companies so engaged, which may be, in legal contemplation, either closely or remotely so "connected," and either through transactions interstate in character, or intrastate in character, or both. But whether we resolve the doubt over the phraseology of this entire first section in favor of the broad or the narrow interpretation is unimportant, unless the particular construction adopted is, in fact, supported by the express terms contained in the succeeding sections, that is, in the body of the act, because section 1 is but a preamble and cannot foreclose judicial inquiry. It cannot enlarge or confer powers, or control the words employed in the provisions of the act itself. Yazoo Railroad Co. v. Thomas, 132 U.S. 174, 10 S.Ct. 68, 33 L.Ed. 302; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. So we must proceed to examine these provisions.

First, as to definitions: "Persons" means an individual or company. Section 2 (a) (1), 15 U.S.C.A. § 79b(a) (1). "Company" means a corporation, a partnership, an association, a joint-stock company, a business trust, or an organized group of persons, whether incorporated or not; or any receiver, trustee, or other liquidating agent of any of the foregoing in his capacity as such. Section 2 (a) (2), 15 U.S.C.A. § 79b (a) (2). "Electric utility company" means any company which owns or operates facilities for the generation and distribution for sale of electric energy. The commission shall declare a company not an electric utility company if it finds (A) such company is primarily engaged in a business other than an electric utility, and sells such a small amount of electric energy that it is not necessary in the public interest or for protection of investors or consumers that it be considered an electric utility company, or

(B) such company operates in a single state and substantially all of its securities are owned by a manufacturing company which uses energy which it generates, and such manufacturing company is not controlled by any other company. The filing in good faith of an application shall exempt applicant until the commission has acted on such application. The commission may require periodic applications for renewal of exemption order, may revoke or modify such order, and may attach conditions or terms thereto. The commission may by rule or regulation exempt any class or classes of companies or persons who fall within (A) or (B). Section 2 (a) (3), 15 U.S.C.A. § 79b(a)(3). "Gas utility company" means any company which owns or operates facilities for the retail distribution of natural or manufactured gas. Provisions are made for exemption similar to those for an "electric utility company." Section 2 (a) (4), 15 U.S.C.A. § 79b(a) (4). "Public utility company" means electric utility or gas utility company. Section 2 (a) (5), 15 U.S.C.A. § 79b(a)(5). "Holding company" means (A) any company which directly or indirectly owns, controls, or holds with power to vote, 10 per cent. or more of the outstanding voting securities of a public utility company or of a holding company; and (B) any person found by the commission to exercise either along or with other persons such a controlling influence over a public utility company or a holding company as to make it necessary in the interest of the public, investors, or consumers that such person be subject to the act. The commission shall declare a company not a holding company under clause (A) upon finding the company (i) does not in any manner control a public utility company or holding company, (ii) is not an intermediary company through which such control is exercised, and (iii) does not in any manner exercise such a controlling influence over the management and policies of a public utility company or holding company as to make it necessary that it be subject to the act. The filing in good faith of an application for exemption under this provision shall exempt the applicant until the commission has acted on such application, which the commission shall do within a reasonable time. The commission may require periodic applications for renewal of the exemption order, may revoke or modify such order, and may attach conditions or terms thereto. Section 2 (a) (7), 15 U.S.C.A. § 79b(a) (7). "Subsidiary company" means (A) any

company, 10 per cent. or more of whose outstanding voting securities are owned, controlled, or held with power to vote directly or indirectly by a holding company; (B) any person whose management or policies are subject to a controlling influence by a holding company or companies either alone or with other persons so as to make it necessary in the interest of the public, investors, or consumers that such person be subject to the act. The commission shall declare a company not a subsidiary under clause (A) upon finding (i) such company is not controlled in any manner by a holding company, (ii) is not an intermediary company through which such control is exercised, and (iii) its management and policies are not subject to a controlling influence by any holding company or companies so as to make it necessary that it be subject to the act. The filing in good faith of an application for exemption under this provision shall exempt the applicant until the commission has acted on such application, which the commission shall do within a reasonable time. The commission may require periodic applications for renewal of exemption order and may revoke or modify such order. Section 2 (a) (8), 15 U.S.C.A. § 79b(a) (8).

"Holding company system" means a holding company, together with all its subsidiaries, and mutual service companies of which the holding company or any subsidiaries are members. Section 2 (a)(9), 15 U.S.C.A. § 79b(a) (9). "Associate company" means any company in same holding company system. Section 2 (a) (10), 15 U.S.C.A. § 79b(a) (10). "Affiliate" means (A) any person directly or indirectly owning, controlling, or holding with power to vote 5 per cent. of outstanding voting securities of a specified company; (B) any company, 5 per cent. of whose voting securities are owned, controlled, or held with power to vote, by a specified company; (C) officer or director of specified company or of any company which is an affiliate thereof under (A); (D) person so related to specified company that, in the opinion of the commission, after notice and opportunity for hearing, there is liable to be such an absence of arm's length bargaining as to make it necessary in the public interest or for protection of investors or consumers that he be considered an affiliate. Section 2 (a) (11), 15 U.S.C.A. § 79b(a) (11). "Registered holding company" means any person registered under section 5 (15 U.S.C.A. § 79e). Section 2 (a) (12), 15 U.S.C.A. §

79b(a) (12). "Mutual service company" means any company approved as such under section 13. Section 2 (a) (13), 15 U.S. C.A. § 79b(a) (13). "Member company" means a company which is member of group served by a mutual service company. Section 2 (a) (14), 15 U.S.C.A. § 79b(a) (14). "Integrated public-utility system" means (A) electric: One or more units of generating plants and/or transmission lines and/or distributing facilities, owned by one or more electric utility companies, actually or capable of being physically interconnected, which may be economically operated, under normal conditions, as a single interconnected and coordinated system, in a single region in one or more states; not so large as to impair advantages of localized management, efficient operation, and effectiveness of regulation; and (B) gas: One or more gas utility companies so located and related that they can be operated more economically as a single coordinated system, in a single region in one or more states; not so large as to impair advantages of localized management, efficient operation, and effective regulation. Companies deriving natural gas from a common source of supply may be deemed to be in a single region. Section 2 (a) (29), 15 U.S.C.A. § 79b(a) (29).

No person shall be deemed to be a holding company, or a subsidiary, solely because of "controlling influence," or an affiliate solely because of "absence of arm's length bargaining," except upon order of the commission after hearing, or declaring a class, of which such person is a member, to be affiliates. Such order shall not become effective until at least 30 days after mailing copy thereof to such person, and may be revoked by the commission. In case of determination of affiliates by class or classes, such shall not become effective until 30 days after appropriate publication. Section 2 (b), 15 U.S.C.A. § 79b(b).

Various other definitions are given, but because so obvious, they need not be here referred to.

Next as to exemptions: The commission, by rules and regulations upon its own motion, or by order upon application, shall exempt a holding company and subsidiaries, except in so far as it finds exemption would be detrimental to public interest, or interests of investors or consumers, if (1) business of holding company and all public utility subsidiaries from which it derives any material part of its income, is carried on sub-

stantially in a single state in which all such companies are organized; (2) holding company is predominantly a public utility company whose operations as such do not extend beyond the state in which organized and states contiguous thereto; (3) holding company is primarily engaged or interested in business other than that of public utility and (A) not deriving material part of its income from subsidiaries engaged principally in public utility business, or (B) if deriving material part of its income from such subsidiaries, owning substantially all of the outstanding securities of such companies; (4) temporarily a holding company because of a liquidation or distribution in connection with a bona fide debt previously contracted or a bona fide arrangement for underwriting or distribution of securities; or (5) the principal business in the United States of neither the holding company nor its subsidiaries from which it derives any material part of its income is that of a public utility company. Section 3 (a), 15 U.S.C.A. § 75c(a). The commission shall exempt any subsidiary company from any provision of the act, when application thereof to such subsidiary is not necessary in interest of the public or investors, if company derives no material part of its income from source within United States and neither it nor any of its subsidiaries is a public-utility operating in United States. Section 3(b), 15 U.S.C.A. § 79c(b). The filing in good faith of an application under subsection (a) by a person other than a registered holding company, or under subsection (b) by a subsidiary company, exempts applicant until the commission has acted thereon. Upon change of circumstances the commission may revoke any exemption granted under above provisions. Section 3 (c), 15 U.S.C.A. § 79c(c). The commission may conditionally or unconditionally exempt any class or classes of persons from obligations and liabilities of subsidiaries or affiliates, where exemption is deemed necessary or appropriate in interest of public, investors, or consumers and not contrary to purposes of the Act. Section 3 (d), 15 U.S.C.A. § 79c(d).

Next as to regulation of unregistered holding companies: The act makes it unlawful after December 1, 1935, for any holding company, unless registered, directly or indirectly, to (1) sell, transmit, or distribute, or to own or operate utility assets for the transmission or distribution of, gas or electricity in interstate commerce; (2) use mails or instrumentalities of interstate commerce to (a) negotiate or perform service, sales, or construction contracts; (b) distribute, offer for sale or exchange securities of any holding company, public utility, or affiliate; (c) acquire or negotiate for acquisition of securities or utility assets; (3) engage in any business in interstate commerce; (4) own or control securities of subsidiary that does any of foregoing. Section 4 (a), 15 U.S.C.A. § 79d(a). Distribution of securities of holding company through instrumentality of interstate commerce since January 1, 1925, requires registration in conformity with the act, if any such securities were held on October 1, 1935, by nonresidents of state in which company is organized. Section 4 (b), 15 U.S.C.A. § 79d (b).

APPLICATION OF THE ACT TO THE DEBTOR CORPORATION, ITS SUBSIDIARIES, AND THE TRUSTEES.

From the aforegoing analysis of those provisions of the act which are most pertinent to our immediate inquiry, it will be seen that the trustees of the debtor corporation in their capacity as such, and also the American States Electric Company and the Hydro Power Company, are each a holding company within the meaning of the act, because (1) by section 2 (a) (7), 15 U.S.C.A. § 79b(a) (7), that term embraces any company which directly or indirectly owns, controls, or holds with power to vote 10 per cent. or more of the outstanding voting securities of a public utility company; and (2) because of section 2 (a) (2) of the act, 15 U.S.C.A. § 79b(a) (2), a company includes not merely corporations but "any receiver, trustee, or other liquidating agent" of any corporation "in his capacity as such."

It has been suggested that the words "other liquidating agent" employed to qualify the term "trustee" should be given a strict interpretation, and that since the present trustees are not now engaged in liquidating the debtor corporation, they are not the type of trustees contemplated by section 2 (a) (2). However, this interpretation is, we think, too strained and also contradicted by the history of the enactment of this provision of the law. It appears that in both the Senate (S. 1725) and House (H.R. 5423) texts of the bill as originally introduced, the phrase was "any receiver, trustee, or other liquidating agent of any of the foregoing." Later, when the House Committee reported the bill, these words were stricken out. Thereafter, the conferees adopted a defi-

nition which was a combination of both the House and Senate definition, and which read as does the law as it now stands; the phrase "in his capacity as such" being added.

On this point the report to the House by the House conferees stated (page 65) that in section 2 (a) (2) of the Senate Bill, the definition of "company" includes "a receiver, trustee, or liquidating agent" of a company. The substitute agreed to in conference adopts this language with an addition, so that the definition only includes such a person "in his capacity as such." It is to be noted that the word "other" is omitted in this report, which would seem to indicate that the draftsmen of the definition had no intention of limiting the word "receiver" or the word "trustee" by the words "other liquidating agent." To limit the scope of the definition of the word "company" so as to include only those receivers and trustees who may be engaged in liquidating would seem directly to negative the real purpose of the act, which is presumably more concerned with those companies which have an expectancy of continued existence than with those which are in process of being liquidated. See section 11 (f) and (g), 15 U.S.C.A. § 79k(f, g). Furthermore, if this section were given the narrow interpretation as suggested, it would leave a serious loophole in the act; that is to say, it would be a simple matter for any holding company, adversely affected by the act, to place itself under court jurisdiction by having a receiver or trustee appointed, and thereby avoid any consequences of the act as long as such receivership or trusteeship continued. That the broader construction is the only reasonable one is also confirmed by the definition of the word "corporation" to be found in title 2 of the act (section 201, 16 U.S.C.A. § 796), which includes "a receiver or receivers, trustee or trustees of any of the foregoing." While it is worthy of notice that section 77B of the Bankruptcy Act is nowhere mentioned in the entire Public Utility Act, it is constitutional [see Campbell v. Alleghany Corporation (C.C. A.) 75 F.(2d) 947, certiorari denied 56 S. Ct. 92, 80 L.Ed. ——, October 14, 1935; In re Central Funding Corporation (C.C. A.) 75 F.(2d) 256], and proceedings thereunder are not to be presumed to have been ignored (see again (section 11 (f) and (g), 15 U.S.C.A. § 79k(f and g); nor can we ignore the fact that under section 77B of the Bankruptcy Act as amended, power to liquidate is only one of the many powers of a trustee.

All of the subsidiaries and subsubsidiaries of the debtor corporation in the present proceeding are likewise unquestionably subject to the act, for "a subsidiary company" "of a specified holding company" is defined as any company 10 per cent. or more of the outstanding voting securities of which are directly or indirectly owned, controlled, or held with power to vote by such holding company, or by a company that is a subsidiary of such holding company.

All of the companies before the court in these reorganization proceedings being thus directly within the definitions of the act, we must next consider whether any exemption from its provisions is open to the trustees or to the debtor corporation or to its subsidiaries.

From the review of the exemption provisions of the act which has just been made, it is equally self-evident that neither the debtor corporation, its subsidiaries, nor the trustees, are within any of those classes which the commission is empowered to exempt from the operation of the act, even though it be assumed that such exemption would not be detrimental to the public interest or to the interest of investors or consumers. Neither the debtor or the trustees fall within any of the classes mentioned in section 3 (a) (1–5). They do not fall within section 3 (a) (1) because the debtor and its subsidiaries are not organized in a single state in which their business is carried on. Also, the debtor is not predominantly a public utility company whose operations as such do not extend beyond the state of its organization and states contiguous thereto, so as to entitle it to an exemption under section 3 (a) (2). Similarly, since the debtor is primarily a holding company, it cannot claim any benefit of exemption under section 3 (a) (3) as a company primarily engaged or interested in one or more businesses other than the business of a public utility company and only incidentally a holding company. Nor is the debtor temporarily a holding company solely by reason of the acquisition of securities for purposes of liquidation or distribution in connection with a bona fide debt previously contracted, or in connection with a bona fide arrangement for the underwriting or distribution of securities, as provided in setcion 3 (a) (4). Again, since the debtor derives practically all of its income from subsidiary, public utility companies, it is not entitled to that exemption accorded a holding company whose principal business is not that of a public utility company, and

which derives no material part of its income directly or indirectly from public utility subsidiary companies as specified in section 3 (a) (5).

Turning to the subsidiary companies, they likewise are not within any of the classes named as possible beneficiaries of an exemption under section 2 (a) (8). It is true section 3 (d) gives to the commission broad discretion to exempt any specified class or classes of persons from the obligations imposed upon them as subsidiary companies or affiliates, but this exemption is to be granted only "if and to the extent that it deems the exemption necessary or appropriate in the public interest or for the protection of investors or consumers and not contrary to the purposes of this title [chapter]." It would clearly be contrary to the purposes of this title to attempt to exercise any such discretion with respect to the present subsidiary companies.

### THE ACT'S REQUIREMENTS.

Having thus determined that the trustees, the debtor corporation, and its subsidiaries are not entitled to claim exemption under the act, we must next turn to a consideration of what is required of them. The first requirement is that at any time after October 1, 1935, but in no event later than December 1, 1935, the trustees or any holding company formed under any of the plans for the reorganization of the debtor corporation shall file with the commission a notification of registration as a holding company, to be followed later by an elaborate statement. Section 5, 15 U.S.C.A. § 79e. If they fail or refuse so to register, section 4 (a) recites in detail the prohibitions which result, which, summarized very briefly, are that they can no longer transact business of any sort in the utility field; cannot use the mails or any means or instrumentalities of interstate commerce in connection with any kind of contract for services or construction work for, or for the selling of goods to, any public utility or holding company; nor can they use the mails or any means or instrumentality of interstate commerce for the distribution or sale as a public offering of any of their securities, or for the acquisition of any security or utility assets of any subsidiary or affiliate, or of any public-utility or any other holding company; nor can they engage in any business in interstate commerce, or own, control, or hold with power to vote, any security of any subsidiary company that has done any of the foregoing forbidden acts.

In addition to the aforegoing, section 26 (b), 15 U.S.C.A. § 79z(b), provides that contracts in violation of the act are void, and section 29, 15 U.S.C.A. § 79z—3, imposes a fine, not exceeding $10,000, or imprisonment for not more than two years or both, for willful violation of the orders of the commission passed pursuant to the act; and further provides that a fine not exceeding $200,000 may be imposed for violation by a holding company, not an individual, of the prohibitions just enumerated. This latter fine would thus become applicable to each of the trustees in the present proceeding, if any of the forbidden acts are committed by them.

Immediately upon registration with the commission, it would become unlawful for the trustees or any holding company formed under any of the plans of reorganization (a) to borrow or receive credit or indemnity from any public utility company in the same holding company system (section 12 (a), 15 U.S.C.A. § 79l(a); (b) to sell from house to house any of their securities, (section 6 (c) (1), 15 U.S.C.A. § 79f(c) (1); (c) to cause any officer or employee of any subsidiary company to sell or cause any of them to be sold (section 6 (c) (2), 15 U.S. C.A. § 79f(c) (2); (d) to make any contribution of a political nature (section 12 (h) (1), 15 U.S.C.A. § 79l(h) (1); (e) to enter after the first day of April, 1936, into, or take any step whatsoever, by the use of any means in, the performance of any service, sales, or construction contract with any associate company which is a public utility company (section 13 (a), 15 U.S.C.A. § 79m (a); (f) to issue any securities other than common stock having a par value and without preferences, and bonds secured by first lien on physical assets (section 7 (c) (1), 15 U.S.C.A. § 79g(c) (1). Furthermore, upon registration it would become unlawful for the trustees of any company under the proposed reorganization, without the prior approval of the commission, by the use of any means whatsoever, (a) to issue or sell any security of such company or of any subsidiary company (section 6 (a) (1), 15 U.S. C.A. § 79f(a) (1); (b) to exercise any privilege or right to alter the priorities, preferences, voting power or other right of the holders of any outstanding security of such companies (section 6 (a) (2), 15 U.S. C.A. § 79f(a) (2); (c) to borrow money on any note or draft having a maturity of more than nine months or to an amount exceeding 5 per cent. of the principal amount of the par value of the other securities of

such registered holding company then outstanding (section 6 (b), 15 U.S.C.A. § 79f (b); (d) to acquire directly or indirectly any security or utility assets or any other interest in any business, (section 9 (a) (1), 15 U.S.C.A. § 79i(a) (1); (e) to lend or extend its credit to or indemnify any company in the same holding company system, or to receive any loan, credit, or indemnity therefrom (section 12 (b), 15 U.S.C.A. § 79*l* (b); (f) to declare or pay any dividend on any security of such holding company or to acquire, retire, or redeem any security of same (section 12 (c), 15 U.S.C.A. § 79*l*(c); (g) to sell any security which they or it might own in any public utility company or any utility assets (section 12 (d), 15 U.S.C.A. § 79*l*(d); (h) to solicit any proxy, power of attorney, consent, or authorization regarding any security of a registered holding company or of a subsidiary company (section 12 (e), 15 U.S.C.A. § 79*l* (e); (i) to negotiate or enter into or take any step in the performance of any transaction not otherwise unlawful under the act, with any company in the same holding company system, or any affiliate thereof (section 12 (f), 15 U.S.C.A. § 79*l*(f); (j) to keep their or its accounts or records otherwise than as the commission shall prescribe (section 15 (e), 15 U.S.C.A. § 79*o*(e).

In addition, as a result of registration, the trustees and the reorganized company and its officers would be required (a) to file elaborate reports which in the commission's discretion could be made public (sections 14 and 22 (a), 15 U.S.C.A. §§ 79n, 79v (a); (b) to produce all books and records, and to have their corporate officers available to testify relating to such matters as the commission might require (section 18, 15 U.S.C.A. § 79r); (c) to refrain from employing attorneys or other persons to appear before the commission or before the Congress or the Power Commission, without first filing a complete disclosure of the terms of employment and the expenses incurred by the attorneys (section 12 (i), 15 U.S.C.A. § 79*l*(i); (d) to require its officers, and directors to file statements setting forth beneficial ownership in securities owned in both holding and subsidiary companies with all profits on transactions within a six months' period going to the company (section 17, 15 U.S.C.A. § 79q); (e) to refrain from having as an officer or director any executive officer or representative of a bank or investment banking company (section 17 (c), 15 U.S.C.A. § 79q(c).

Finally, as a result of such registration, no reorganization plan for the debtor corporation could become effective unless approved by the commission prior to submission to this court (section 11 (f), 15 U.S.C.A. § 79k(f); and no person could solicit deposits or consents in respect to any reorganization plan unless that plan has been proposed by or submitted to the commission and the solicitation is accompanied by a copy of the commission's report on the plan, Section 11 (g), 15 U.S.C.A. § 79k(g). In short, what the dealers (referred to in the order of this court under date of July 19, 1935) have been permitted to do, and are now doing, would be prohibited under the act in the event of registration by the trustees, the debtor corporation, or any of its subsidiaries. But the act goes much further, and declares, without qualification (section 10 (c) (2), 15 U.S.C.A. § 79j(c) (2), that the commission "shall not approve * * * (2) the acquisition of securities or utility assets of a public-utility or holding company *unless the Commission finds that such acquisition will serve the public interest by tending towards the economical and efficient development of an integrated public-utility system.*" (Italics inserted). An "integrated electric public-utility system," as has already been explained, is defined in the act (section 2 (a) (29), 15 U.S.C.A. § 79 b(a) (29), as one or more units of generating plants, transmission lines, or distributing facilities which are *actually, or are capable of being physically, interconnected and operated as a single interconnected and coordinated system* in one or more states. We have seen that of the eight subsidiaries of the debtor holding company in the present proceeding, six, either directly or indirectly generate and sell electric energy in as many different states, to wit, Michigan, Indiana, Montana, Idaho, Oregon, and California; that such business, however, is in every case exclusively intrastate, that is to say, there are seven separate, purely intrastate systems—one in Michigan, one in Indiana, one in Montana, two in Idaho, one in Oregon and one in California—and it is conceded by all, as it must be from the factual standpoint, that the facilities of none of these companies are capable of being physically interconnected, or operated as a single, inter-connected, co-ordinated system. So it follows that by no reasonable interpretation of the language employed in section 10 (c) (2) of the act (above quoted) can *any* holding company plan for these various subsidiary companies of the debtor

corporation, "serve the public interest by tending towards the economical and efficient development of an integrated public-utility system," as this clause is there understood.

It is further to be noted that section 10 (c) (1) of the act, 15 U.S.C.A. § 79j(c) (1), provides, without qualification, that the commission shall not approve an acquisition of securities which is detrimental to the carrying out of the provisions of section 11 of the act. This latter section (subsection b, 15 U.S.C.A. § 79k(b)) makes it the duty of the commission, as soon as practicable after January 1, 1938, to require every registered holding company, and each of its subsidiaries, to take such action as the commission shall find necessary to limit the operations of the holding company system, of which such company is a part, to a single "integrated public-utility system." There is a proviso to this subsection to the effect that the commission may permit a holding company to continue to control one or more additional integrated, public utility systems, but it can only do this if it finds, in addition to other prerequisites which we need not here discuss, that "all of such additional systems are located in one State, or in adjoining States." Section 11 (b) (1) (B), 15 U.S.C.A. § 79k (b) (1) (B). Such not being true with respect to the various companies here involved, it is beyond question that no plan of reorganization could, by the very terms of the act, be allowed which contemplated joint control of (1) the Michigan and Indiana subsidiaries and (2) the Idaho, Montana, Oregon, and California subsidiaries, since they are not all in adjoining states.

The court's attention has been directed to the following rule promulgated by the commission, as a result of which it has been suggested that a holding company, under a plan of reorganization may now acquire control of the various subsidiaries involved in the present proceeding, without first obtaining the approval of the commission; that, therefore, the Public Utility Holding Company Act does not at the present time stand as a barrier to the consummation of a plan of reorganization; and that thus there is no occasion for passing upon the constitutionality of that law:

"Acting pursuant to the authority granted by section 3 (d) of the Public Utility Holding Company Act of 1935, and finding such action necessary and appropriate in the public interest and for the protection of investors and consumers, and not contrary to the purposes of said Act, the Securities and Exchange Commission hereby adopts the following rule:

"Rule 3D–1. Temporary exemption of affiliates from Section 9 (a) (2). Every person who is an affiliate of any public-utility company under Clause (A) of Section 2 (a) (11) or who will become such an affiliate by virtue of the acquisition by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, of any security of any public-utility company, shall be exempt from the provisions of Section 9 (a) (2), and shall not be deemed an affiliate within the meaning of such provisions until rules or regulations pursuant to section 10 (a) specifying the manner in which application is to be made for approval of such acquisitions shall have become effective, upon condition that prior to October 1, 1935, or within 15 days after such acquisition, such person shall file with the Commission a statement describing the terms and nature of such acquisition and of the security to be acquired and the amount of consideration paid or to be paid therefor."

Suffice it to say, in answer to this suggestion, that if this rule is, in fact, intended to relate to such a situation as the one here in question (a point which we do not assume to be true), it is obviously invalid, because clearly beyond the power of the commission to promulgate, in view of the unambiguous, mandatory language of section 10 (c) which we have just fully analyzed.

The claim that the present proceeding is premature is based also upon the following arguments: First, that the act is permissive only, because even though it provides that those who do not register cannot do certain things, no company is in fact required to register; second, that it is the act of registration, and only that, which puts the law into effect with respect to any particular company, and that, while it is true registration is more than a mere informatory procedure, no company is required to register before December 1, next; and, third, that the debtor corporation has taken no steps towards claiming an exemption under the act.

It is scarcely appropriate to attempt to answer satisfactorily any one of these arguments without at the same time answering all of them, because they are so interrelated; although as to the first argument there is an additional, independent, conclu-

sive answer in that the debtor corporation and its subsidiaries and the trustees do in fact all come within the classifications expressly named in the act; and, furthermore, there is little difference, in legal contemplation, between saying to a corporation that it must do something, and saying that it need not do that particular thing, but if it does not do it, it cannot do anything else.

If the act is valid, the trustees must undoubtedly register unless the debtor corporation is liquidated in advance of the date, to wit, December 1st, when registration becomes compulsory. One group of bondholders, parties to the present proceeding, assert that the act is valid and that the only thing for the debtor corporation to do is to liquidate, because this group asserts that the other alternative—registration—and the consequent subjection of the debtor corporation and its subsidiaries to the provisions of the act would of necessity spell defeat of either of the plans of reorganization that have been proposed to this court, or of any other plan of reorganization that can be conceived as in any sense practicable or workable. On the other hand, the position of the trustees and of the reorganization managers, speaking, in so far as they legally may, for a very large proportion of the holders of the debtor corporation's securities who have intrusted their interests to these managers, and of the intervening creditor, Lautenbach, is that liquidation is ill advised, and would be confiscatory at the present time of the interests of the bondholders of the debtor corporation, because of total inability to find a market for the properties at anything akin to fair-value prices. Thus the trustees, the reorganization managers, and the intervening creditor all claim that they not only should not, but cannot, be required to liquidate, because, as they assert, the act is invalid, and they seek a declaration to this effect, so that they may be permitted to proceed with the reorganization of the debtor corporation under one of the pending plans, or under such other plan as the court may ultimately determine is the most feasible. It is appropriate here to point out that the court is itself satisfied that liquidation at the present time would be very definitely against the best interests of all classes of holders of the debtor's securities, if not indeed actually confiscatory.

 Liquidation is not in any sense dependent upon any provisions of the act. There is no provision for claiming exemp-

tion merely for the purpose of liquidating. The five situations under any of which a holding company might apply for exemption are, as we have already explained, beyond any question nonexistent in the present case. It is true that under section 3 (c), 15 U.S.C. A. § 79c (c); when an application is filed for an exemption, such affords an interim exemption from all obligations under the act until the commission has acted upon such application. It is further true that such action might be indefinitely deferred in the discretion of the commission, because there must first be a hearing, and due notice and opportunity given to all interested parties to be present and to be heard. But such interim exemption is only accorded by the express language of sections 3 (c) if the application is filed in "good faith," and obviously the debtor corporation in the present case could not in good faith file an application for exemption. Further, and quite apart from the question of good faith, since any application for exemption would be futile, the debtor corporation or the trustees are not to be charged with premature action in the present proceeding on the ground that they have not yet done a futile act.

The question is thus squarely presented: Should the trustee register under the act and simply wait and see what the commission may do in its own good time? Obviously not, because from the moment of registration the trustees become subject primarily to the power and control of the commission. The power of this court thereafter to administer the affairs of the debtor corporation through these trustees disappears, and the only thing which the commission could, under the act, lawfully require the trustees to do would be to liquidate the debtor corporation which, as we have just seen, is a thing which neither this court nor the trustees believes should be done in the best interests of the security holders of the debtor corporation; and, as we have also seen, if liquidation should be required, it is in no respect dependent upon anything contained in the act, but can be ordered by this court and presumably perfected in advance of the date, to wit, December 1st, by which all holding companies are required to register under the act. If liquidation is compulsory, and it can only be compulsory if the act is valid, then the trustees should, effective at once, be forbidden to expend any sums in furtherance of any of the pending plans of reorganization, or any other plan of reorganization,

because such would be a waste of the debtor corporation's estate. On the other hand, if liquidation is not compulsory, which can only be true if the act is invalid, then the trustees should be authorized, effective immediately, to resume making proper disbursements in furtherance of such reorganization plan as is believed by the court to be in the best interests of the security holders of the debtor corporation.

In other words, the orders of this court heretofore passed with respect to such disbursements should not remain in suspense, but should continue to apply. In short, the case as presented is not one where the issue is dependent upon what the commission may do, if and when the debtor corporation has registered under the act. If it were, then, of course, it would be not only proper but necessary to defer any decision on the part of this court until the commission might have acted. But in the present case, it is clearly and definitely ascertainable from the express provisions of the act what the commission can and must do with the debtor corporation, if the debtor corporation may validly be subjected to the act's provisions. Thus the jurisdiction and power of this court over the debtor corporation is either superseded by the power and jurisdiction of the commission, or it is not, because, to repeat, if the act is valid, the argument for compulsory liquidation is inescapable; if, on the other hand, the act is invalid, the power and jurisdiction of this court continues as heretofore. And so this question must and should be determined in advance and independently of any date named in the act for fixing the jurisdiction of the commission, because, as we have seen, the trustees are under orders of this court to do certain things *now,* to wit, to progress, and to expend money in progressing, a plan of reorganization, already long deferred, and they are entitled to instructions as to whether they can lawfully proceed, without waiting until a certain date is reached, after which the commission might attempt to assert authority which it may have no power to assert, and the assertion of which, furthermore, might, in the discretion of the commission, be indefinitely postponed, in turn resulting in an indefinite suspension of the exercise by this court of its power and jurisdiction to require the carrying out of such orders as it finds to be best calculated to protect the interests of the security holders of the debtor corporation, under section 77B of the Bankruptcy Act, as amended.

It is, of course, too firmly established to require comment that the federal courts are without jurisdiction to entertain cases where no justiciable controversy between bona fide adverse litigants is presented. United States v. West Virginia, 295 U.S. 463, 55 S.Ct. 789, 79 L.Ed. 1546; Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154; Willing v. Chicago Auditorium Association, 277 U.S. 274, 48 S.Ct. 507, 72 L.Ed. 880; Liberty Warehouse Co. v. Grannis, 273 U.S. 70, 47 S.Ct. 282, 71 L.Ed. 541; New Jersey v. Sargent, 269 U.S. 328, 46 S.Ct. 122, 70 L.Ed. 289; Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; Texas v. Interstate Commerce Commission, 258 U.S. 158, 42 S.Ct. 261, 66 L.Ed. 531; Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246. It is equally well established that the federal courts have no power per se to review and annul an act of Congress on the ground of unconstitutionality, unless the justification for some direct injury, suffered or threatened, presenting a justifiable issue, is made to rest upon such act. United States v. West Virginia; Arizona v. California; Liberty Warehouse Company v. Grannis; New Jersey v. Sargent; Massachusetts v. Mellon, supra; Braxton County Court v. West Virginia, 208 U.S. 192, 28 S.Ct. 275, 52 L.Ed. 450. But in the present case, justification for the liquidation of the debtor corporation which the one side, to wit, Burco, Inc., asks the court to compel, but which the other side, to wit, the trustees and the intervening reorganization managers and individual debenture holder, asks the court not to compel, but to proceed to reorganize the debtor corporation through the creation of a new holding company and a holding company system which would be in direct contravention of the provisions of that act, rests squarely upon the Public Utility Holding Company Act of 1935. Thus the power which this court is requested to exercise is that of ascertaining and declaring the law applicable to the controversy—a power which clearly exists and must be exercised. Of course, although registering under the act, the trustees might still preserve any constitutional right. See Union Pacific R. Co. v. Public Service Commission, 248 U.S. 67, 39 S.Ct. 24, 63 L.Ed. 131; Power Mfg. Co. v. Saunders, 274 U.S. 490, 47 S.Ct. 678, 71 L.Ed. 1165. But the trustees and the companies for whom they act and speak in this proceeding must protect themselves, under the authority of this court, against very heavy

penalties should they fail to comply with the act's provisions, if the act be unconstitutional; and, on the other hand, against the charge of waste and dereliction of duty in proceeding with expenditures for reorganization, if the act be constitutional. The very passage of the act constitutes a barrier to the trustees in the performance of what they have, up to its passage, correctly understood to be their duties. Actions sometimes are not premature, even though instituted long before the effective date of a given law, on the firmly established equitable principle that impending injury by unlawful action should be prevented. See Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468.

Lastly, the government argues that since Congress, under its bankruptcy power and its power to constitute federal tribunals inferior to the Supreme Court, has the authority to regulate the practice and procedure to be followed in federal courts and by trustees appointed by these courts, and since Congress in the Public Utility Act has regulated the practice and procedure regarding the administration of utility holding companies' estates in bankruptcy in these courts, neither the trustees nor the creditors they represent have such an interest as permits them to question the act, even assuming that the act might infringe upon the constitutional rights of other persons, and that its provisions are not separable in their relation to bankruptcy proceedings. But the fallacy of this argument is too apparent to require much discussion. First, it is tantamount to saying that because Congress has the power to establish inferior courts, it thereby has the power to dictate to those courts how this or that act of Congress must be interpreted in relation to the Constitution—a concept which would obliterate that distinct separation of the different branches of our government which is the very foundation upon which the entire Constitution is predicated and constructed. Second, the argument is in effect an assertion that the power of Congress over bankruptcy matters is unbounded. The government in its brief states that "it has never been supposed that a mere statutory privilege to reorganize [under Section 77B], granted by Congress, which has not yet been availed of creates a constitutional right to the continuance of that privilege unsullied by further Act of Congress." The answer to this argument is complete and uncontrovertible. First, the Public Utility Holding Company Act is not a law "on the subject of bankruptcies," and Congress may not lawfully exercise a power granted to it by the Constitution not in furtherance of the objects sought to be attained by that power, but as a means of accomplishing by indirection what Congress is prohibited by other clauses of the Constitution from accomplishing directly (McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469); and, second, the bankruptcy power, like the other substantive powers of Congress, is subject to the Fifth Amendment. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106. Whether the limitations of the Fifth Amendment have been satisfied, we defer for subsequent consideration.

It follows from the aforegoing that the present proceeding is not premature, and that this court must assume jurisdiction and proceed to determine the validity of the act.

### THE CONSTITUTIONAL QUESTIONS.

We now come to a consideration of the several grounds that are asserted by the trustees and the intervening creditor in support of their argument that the act is unconstitutional, and opposed by Burco, Inc., and by the government. These grounds may be broadly classified as four in number, as follows: First, the act attempts to regulate the activities of holding companies and their subsidiaries, without distinction, whether engaged in intrastate or interstate commerce, and without regard to whether their business directly affects interstate commerce; second, the act excludes from the mails and the instrumentalities of interstate commerce, through arbitrary application of congressional power over the mails and these instrumentalities, things which Congress has no power to regulate; third, the act is arbitrary, unreasonable, and capricious in its provisions, and thereby would deprive the trustees, the debtor, and its subsidiaries of liberty and property without due process of law, in violation of the Fifth Amendment; and, fourth, the act delegates to the Securities and Exchange Commission, without establishing adequate standards to guide its discretion, the legislative power to determine what the law shall be and when and to whom it shall apply, in violation of article 1, § 1, and section 8, cl. 18, of the Constitution.

These separate arguments will be considered in the order just named.

## THE ACT IN RELATION TO THE COMMERCE CLAUSE.

Neither the trustees nor the debtor corporation nor any of its subsidiaries is engaged in interstate commerce. The business of the trustees and the debtor corporation consists in holding the capital stock and other securities of subsidiary companies, in collecting dividends and interest thereon, and in disbursing net earnings to creditors and stockholders. Each subsidiary supplies electricity or water, or both, to the public within the state of its incorporation and not elsewhere; nor in any instance is the electricity or water so furnished obtained or brought from another state. The debtor corporation being exclusively a holding company, neither it nor the trustees have any service, sales, or construction contracts of any kind, with the subsidiaries or with any one else. Nevertheless, the act clearly embraces the debtor corporation, its subsidiaries, and the trustees within its terms. It defines a "public utility company" as "an electric utility company or a gas utility company," regardless of the scope of its business. It is true that section 2 (a) (3) (B), 15 U.S.C.A. § 79b (a) (3) (B), provides that the commission shall declare such company not to be an electric utility company if it is "one operating within a single State," but only if, in *addition,* substantially all of its securities are owned by a manufacturing company which uses energy which it generates, and such manufacturing company is not controlled by any other company, which exception of course does not apply to the situation before us.

Similarly, with respect to the definition of a holding company, no attempt is made to limit its application to such companies as may be engaged in interstate commerce, the standard being solely one of ownership or control, to wit, whether the holding company is one which "directly or indirectly owns, controls, or holds with power to vote, 10 per centum or more of the outstanding voting securities of a public-utility company," as the latter terms is previously defined in the act. See section 2 (a) (7) (A, B), 15 U.S.C.A. § 79b (a) (7) (A, B). Again, the act is made to apply to all subsidiaries of holding companies of which the holding companies own 10 per centum of the voting securities, and those over whose management or policies the holding companies are deemed to exercise a controlling influence. Section 2 (a) (8), 15 U.S.C.A. § 79b (a) (8). The test has no relation whatsoever to the scope of the business carried on, with the result that when a minority stockholder, owning 10 per cent. or more of voting stock of a subsidiary, registers with the commission as he or it is required to do, ipso facto the affairs of such subsidiary become at once completely subject to the control of the commission, even though the business of such subsidiary may be entirely local, or intrastate in character. Enough has already been said about the type of exemptions permissible under the act, and the fact that none of the companies here involved or the trustees are entitled to an exemption, because it is a mandatory condition precedent to the granting of an exemption to them that their business be carried on essentially in a single state in which the holding company (debtor corporation or trustees) and every subsidiary thereof are organized, thus ignoring any test based upon the scope of the business conducted, and making the criterion a uniform charter domicile.

Proceeding from definitions to a consideration of the kind of transactions which the act aims to regulate—and which have already been reviewed in relation to jurisdictional questions, but which we deem it necessary to examine again in direct relation to our immediate inquiry—we again find no limitation based upon the character or scope of the transaction. This is true with respect to (1) unregistered holding companies; (2) registered holding companies and subsidiaries; and (3) affiliates.

As to unregistered holding companies, they are completely outlawed, because in addition to being forbidden to engage in interstate commerce, in any form (section 4 (a) (1) and (5), 15 U.S.C.A. § 79d (a) (1, 5), they may not, by the use of the mails or any means or instrumentality of interstate commerce, do *anything* in connection with *any* service, sales, or construction contract; or in connection with the acquisition, distribution, or sale of securities; nor may they own, control, or hold, with power to vote, any security of any unregistered subsidiary company that has done any of the aforegoing things. Section 4 (a) (2, 3, 4, 6).

As to registered holding companies and subsidiaries, they may not issue or sell any of their securities, no matter where the sale takes place, without a prior declaration to the commission and its approval (section 6, 15 U.S.C.A. § 79f), and here the restriction

is placed not alone upon sale "by use of the mails or any means or instrumentality of interstate commerce," but by use of these means, *"or otherwise."* The same restriction is placed upon the exercise of "any privilege or right to alter the priorities, preferences, voting power, or other rights of the holders of an outstanding security of such company" (section 6 (a) (2) ; upon the sale of such securities from house to house (section 6 (c) (1) ; upon the sale by any officer or employee of any subsidiary company (section 6 (c) (2) ; upon the acquisition of securities and utility assets, of any kind, or "any other interest in any business" (section 9 (a) (1), 15 U.S.C.A. § 79i (a) (1), with the sole qualification, unimportant from the present constitutional aspect—that this prohibition is not applicable to the acquisition of utility assets which has been expressly authorized by a state commission, and which belong to companies all of which are embraced in one integrated system in the same state, and whose business is confined to that state.

As to affiliates, the same sweeping restrictions are expressly applied (section 9 (a) (2). Finally, we find even more drastic provisions relating to registered holding companies, their subsidiaries and affiliates alike, to the effect that the commission may prescribe such terms and conditions in respect to the acquisition of security and utility assets, including the price to be paid for them, as the commission may find "necessary or appropriate in the public interest or for the protection of investors and consumers." Section 10 (a). Inter-company borrowing, lending, declaration of dividends, sales of property, and solicitation of proxies are all prohibited "by use of the mails or any means or instrumentality of interstate commerce, or otherwise," except in cases where first authorized by the commission (section 12 (a to e) ; and then follow catch-all clauses, forbidding registered holding companies or subsidiary companies "by use of the mails or any means or instrumentality of interstate commerce, or otherwise" to negotiate, enter into, or take any steps in the performance of "any transaction not otherwise unlawful under this title [chapter]," with any company in the same holding company system or with any affiliate, unless with the commission's approval (section 12 (f) and (g) ; and likewise forbidding them to make any political contributions (section 12 (h). After April 1, 1936, the same broad restrictions are placed upon inter-company service, sales, and construction contracts unless authorized by the commission. Section 12 (a to f).

It thus appears from the aforegoing critical analysis of the act that no attempt is made, in the language employed, to distinguish between intrastate and interstate business. Likewise, we find no such distinction in the declaration of the policy of the act, contained in section 1, which we have already critically analyzed.

Pyramiding or multiplication of ownership or control appears to be the thing anathematized by the act, on the premise that because the securities evidencing such ownership and control move through the mails and mediums of interstate commerce, congressional power attaches, and unity of domicile seems to be the only basic criterion for exemption.

Having thus seen that the act, by its express terms, attempts to regulate all the activities of registered holding companies, their subsidiaries and affiliates, whether intrastate or interstate, we now turn to a consideration of whether this is a valid exercise of congressional power under the commerce clause of the Constitution (article 1, § 8 cl. 3).

Under that clause, Congress has power not merely to regulate that which engages or moves in interstate commerce, but also that which directly affects interstate commerce. But this is by no means tantamount to saying that one who engages in interstate commerce thereby submits all his business, intrastate as well as interstate, to the regulatory power of Congress, or, in other words, that regulation of so much of a business as constitutes interstate commerce can be extended to embrace the rest.

First, then, we must determine whether by any established principle of constitutional law, the debtor corporation, the trustees, or any of the subsidiaries in the present proceeding, may be treated as engaged in interstate commerce. Thus we turn to a consideration of how the Supreme Court has dealt with factual situations, the same as, or akin to, those now before us.

It is well established that ownership of stock in a corporation (whether engaged in interstate or intrastate commerce) does not constitute participation on the part of stockholders in the business in which such company is engaged. Peterson v. Chicago, Rock Island & Pacific R. Co., 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841; Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Pullman's Pal-

ace Car Co. v. Missouri Pacific R. Co., 115 U.S. 587, 6 S.Ct. 194, 29 L.Ed. 499; Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348. Where fraud or law violation by indirection is the underlying motive, the corporate entity may be disregarded. See Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679; United States v. Union Pacific R. Co., 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124; United States v. Reading Co., 226 U.S. 324, 33 S.Ct. 90, 57 L.Ed. 243; United States v. Lehigh Valley R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458; United States v. Delaware, Lackawanna & Western R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438; United States v. Lehigh Valley R. Co., 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253; Chicago, M. & St. Paul R. Co. v. Minneapolis Civic Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229; Southern Pacific Terminal Co. v. Interstate Commerce Comm., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310. But, even if the corporate entities be disregarded in the present case, and the debtor corporation, or the trustees, be treated as one and the same with the subsidiaries, we still, on the facts presented, would have no interstate commerce, since neither the debtor corporation (the trustees), nor any of the subsidiaries, are, as we have seen, engaged in interstate commerce, unless the intrastate activities of a number of different companies in different states may be treated as having been transformed into interstate commerce while affiliated through stock ownership, because of their use of (a) the mails, or (b) the instrumentalities of interstate commerce. But this cannot be done, because the use of the mails and instrumentalities of interstate commerce is purely incidental to the intrastate activities. Thus, it has been held, with respect to the following types of businesses, that the fact that the mails or instrumentalities of interstate commerce are used by them does not convert them into businesses of an interstate character, and thereby subject them to federal regulation or control or immunize them from state regulation or control; insurance companies [Paul v. Virginia, 8 Wall. 168, 19 L.Ed. 357; New York Life Insurance Co. v. Deer Lodge County, 231 U.S. 495, 34 S.Ct. 167, 58 L.Ed. 332]; theatrical or athletic entertainers [Hart v. B. F. Keith Vaudeville Exchange (C.C.A.) 12 F.(2d) 341, 47 A.L.R. 775, certiorari denied 273 U.S. 703, 47 S.Ct. 97, 71 L.Ed. 849; Federal Baseball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357]; advertising agencies [Blumenstock Brothers Adv. Agency v. Curtis Publishing Co., 252 U.S. 436, 40 S.Ct. 385, 64 L.Ed. 649]; credit agencies [United States Fidelity & Guaranty Co. v. Kentucky, 231 U.S. 394, 34 S.Ct. 122, 58 L.Ed. 283]; those buying and selling cotton futures [Ware & Leland v. Mobile County, 209 U.S. 405, 28 S.Ct. 526, 52 L.Ed. 855, 14 Ann.Cas. 1031]; those dealing in negotiable notes [Hemphill v. Orloff, 277 U.S. 537, 48 S.Ct. 577, 72 L.Ed. 978]; or in bills of exchange [Nathan v. Louisiana, 8 How. 73, 12 L.Ed. 992]; or those engaged in a great variety of other activities which it is unnecessary to enumerate.

The distinction between the incidental use of the mails and instrumentalities of commerce, and their primary use, is well demonstrated in International Textbook Co. v. Pigg, 217 U.S. 91, at page 106, 30 S.Ct. 481, 484, 54 L.Ed. 678, 27 L.R.A. (N.S.) 493, 18 Ann.Cas. 1103, where correspondence courses, the carrying on of which was the textbook company's primary business, through the transmission of books, apparatus, and papers from state to state, were held to be interstate commerce; the court saying: "It is true that the business in which the International Textbook Company is engaged is of a somewhat exceptional character, but, in our judgment, it was, in its essential characteristics, commerce among the states within the meaning of the Constitution of the United States. It involved, as already suggested, regular and practically continuous intercourse between the Textbook Company, located in Pennsylvania, and its scholars and agents in Kansas and other states. That intercourse was conducted by means of correspondence through the mails with such agents and scholars. While this mode of imparting and acquiring an education may not be such as is commonly adopted in this country, it is a lawful mode to accomplish the valuable purpose the parties have in view. More than that; this mode—looking at the contracts between the Textbook Company and its scholars—involved the transportation from the state where the school is located to the state in which the scholar resides, of books, apparatus, and papers, useful or necessary in the particular course of study the scholar is pursuing, and in respect of which he is entitled, from time to time, by virtue of his contract, to information and direction."

Clearly, such use as the debtor corporation, the trustees, and the subsidiary companies make of the mails and the various instrumentalities of interstate commerce, is the everyday, incidental use that every individual or corporation throughout the nation makes of them. The primary business of the debtor corporation and the trustees is the ownership and control of stock; that of the subsidiaries, the generation, distribution, and sale of electric energy, and the distribution and sale of water.

Second, we must determine whether, by any established principle of constitutional law, the business of the debtor corporation, the trustees, or any of the subsidiaries in the present proceeding, may be said to affect interstate commerce directly, even though such business is itself entirely intrastate in character.

The principle whereby we must test the effect of any activity upon interstate commerce, and determine whether it is direct or indirect, has been repeated by the Supreme Court many times, but in no decision is it more clearly or more succinctly stated than in Schechter Poultry Corporation v. United States, supra, in the opinion rendered by Chief Justice Hughes, as follows (295 U.S. 495, at pages 544, 548, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97. A.L.R. 947):

"The power of Congress extends, not only to the regulation of transactions which are part of interstate commerce, but to the protection of that commerce from injury. It matters not that the injury may be due to the conduct of those engaged in intrastate operations. Thus, Congress may protect the safety of those employed in interstate transportation 'no matter what may be the source of the dangers which threaten it.' Southern Railway Company v. United States, 222 U.S. 20, 27, 32 S.Ct. 2, 4, 56 L.Ed. 72. We said in Second Employers' Liability Cases, 223 U.S. 1, 51, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A. (N.S.) 44, that it is the 'effect upon interstate commerce,' not 'the source of the injury,' which is 'the criterion of congressional power.' We have held that, in dealing with common carriers engaged in both interstate and intrastate commerce, the dominant authority of Congress necessarily embraces the right to control their intrastate operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to secure the freedom of that traffic from interference

or unjust discrimination and to promote the efficiency of the interstate service. Houston, E. W. T. R. Co. v. U. S. (The Shreveport Case), 234 U.S. 342, 351, 352, 34 S.Ct. 833, 58 L.Ed. 1341; Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. Co., 257 U.S. 563, 588, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.L.R. 1086. And combinations and conspiracies to restrain interstate commerce, or to monopolize any part of it, are none the less within the reach of the Anti-Trust Act (15 USCA § 1 et seq.) because the conspirators seek to attain their end by means of intrastate activities. Coronado Coal Company v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L. Ed. 963; Bedford Cut Stone Company v. Stone Cutters' Association, 274 U.S. 37, 46, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791. * * *

"In determining how far the federal government ·may go in controlling intrastate transactions upon the ground that they 'affect' interstate commerce, there is a necessary and well-established distinction between direct and indirect effects. The precise line can be drawn only as individual cases ·arise, but the distinction is clear in principle. Direct effects are illustrated by the railroad cases we have cited, as e.g., the effect of failure to use prescribed safety appliances on railroads which are the highways of both interstate and intrastate commerce, injury to an employee engaged in interstate transportation by the negligence of an employee engaged in an intrastate movement, the fixing of rates for intrastate transportation which unjustly discriminate against interstate commerce. But where the effect of intrastate transactions upon interstate commerce is merely indirect, such transactions remain within the domain of state power. If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government. Indeed, on such a theory, even the development of the state's commercial facilities would be subject to federal control. As·we said in the Minnesota Rate Cases, 230 U.S. 352, 410, 33 S.Ct. 729, 745, 57 L.Ed. 1511, 48 L.R.A. (N.S.) 1151, Ann.Cas. 1916A, 18: 'In the intimacy of commercial relations, much that is done in the superintendence of local matters may have an indirect bearing upon interstate

commerce. The development of local resources and the extension of local facilities may have a very important effect upon communities less favored, and to an appreciable degree alter the course of trade. The freedom of local trade may stimulate interstate commerce, while restrictive measures within the police power of the state, enacted exclusively with respect to internal business, as distinguished from interstate traffic, may in their reflex or indirect influence diminish the latter and reduce the volume of articles transported into or out of the state.' Sec, also, Kidd v. Pearson, 128 U.S. 1, 21, 9 S. Ct. 6, 32 L.Ed. 346; Heisler v. Thomas Colliery Co., 260 U.S. 245, 259, 260, 43 S.Ct. 83, 67 L.Ed. 237.

"The distinction between direct and indirect effects has been clearly recognized in the application of the Anti-Trust Act. Where a combination or conspiracy is formed, with the intent to restrain interstate commerce or to monopolize any part of it, the violation of the statute is clear. Coronado Coal Company v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L.Ed. 963. But, where that intent is absent, and the objectives are limited to intrastate activities, the fact that there may be an indirect effect upon interstate commerce does not subject the parties to the federal statute, notwithstanding its broad provisions. This principle has frequently been applied in litigation growing out of labor disputes. United Mine Workers v. Coronado Coal Company, 259 U.S. 344, 410, 411, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; United Leather Workers' International Union v. Herkert, 265 U.S. 457, 464–467, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566; Industrial Association v. United States, 268 U.S. 64, 82, 45 S.Ct. 403, 69 L.Ed. 849; Levering & Garrigues v. Morrin, 289 U.S. 103, 107, 108, 53 S.Ct. 549, 551, 77 L.Ed. 1062. * * *

"While these decisions related to the application of the federal statute, and not to its constitutional validity, the distinction between direct and indirect effects of intrastate transactions upon interstate commerce must be recognized as a fundamental one, essential to the maintenance of our constitutional system. Otherwise, as we have said, there would be virtually no limit to the federal power, and for all practical purposes we should have a completely centralized government."

Further citation and analysis of earlier decisions of the Supreme Court would be merely cumulative and superfluous. The decision in the Schechter Case is conclusive of the question here, because if wages and hours of employment in purely intrastate business do not so directly affect interstate commerce as to bring them within the regulatory power of Congress, then indeed the wish must become father to the thought; logic must yield to speciousness and law to expediency, if the activities of the companies now before this court are to be declared subject to such power. To quote again from the Schechter opinion (295 U.S. 495, at pages 549, 550, 55 S.Ct. 837, 851, 79 L.Ed. 1570, 97 A.L.R. 947): "It is not the province of the Court to consider the economic advantages or disadvantages of such a centralized system. It is sufficient to say that the Federal Constitution does not provide for it. Our growth and development have called for wide use of the commerce power of the federal government in its control over the expanded activities of interstate commerce and in protecting that commerce from burdens, interferences, and conspiracies to restrain and monopolize it. But the authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a state."

Equally axiomatic, and the complement of what we have just considered, is the proposition that one who engages in interstate commerce, and as to which he is subject to federal control, does not thereby submit his entire business, including that which is intrastate, to the regulatory power of Congress. First Employers' Liability Cases, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297; Second Employers' Liability Cases, 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A. (N.S.) 44; Missouri v. Kansas Natural Gas Company, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027; Smith v. Illinois Bell Telephone Co., supra; United States v. Chicago, Milwaukee, St. Paul & P. R. Co., 282 U.S. 311, 51 S.Ct. 159, 75 L.Ed. 359; East Ohio Gas Co. v. Tax Commission of Ohio, 283 U.S. 465, 51 S.Ct. 499, 75 L.Ed. 1171; Utah Power & Light Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038; and Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468. As was said in Second Employers' Liability Cases, supra, (223 U.S. 1, at page 47, 32 S.Ct. 169, 174, 56 L.Ed. 327, 38 L.R.A. [N. S.] 44): "This power over commerce among the states, so conferred upon Congress, is

complete in itself, extends incidentally to every instrument and agent by which such commerce is carried on, may be exerted to its utmost extent over every part of such commerce, and is subject to no limitations save such as are prescribed in the Constitution. But, of course, it does not extend to any matter or thing which does not have a real or substantial relation to some part of such commerce."

Again, only a few months ago, in the Railroad Retirement Board Case, supra, where an act, purporting to establish a compulsory retirement and pension system for all interstate railroads, and sought to be sustained as a measure to promote efficiency, economy, and safety in their operators, was declared invalid under the commerce clause, it was said (295 U.S. 330, at pages 367, 368, 55 S.Ct. 758, 770, 79 L.Ed. 1468): "In final analysis, the petitioners' sole reliance is the thesis that efficiency depends upon morale, and morale in turn upon assurance of security for the worker's old age. Thus pensions are sought to be related to efficiency of transportation, and brought within the commerce power. In supporting the act the petitioners constantly recur to such phrases as 'old age security,' 'assurance of old age security,' 'improvement of employee morale and efficiency through providing definite assurance of old age security,' 'assurance of old age support,' 'mind at ease,' and 'fear of old age dependency.' These expressions are frequently connected with assertions that the removal of the fear of old age dependency will tend to create a better morale throughout the ranks of employees. The theory is that one who has an assurance against future dependency will do his work more cheerfully, and therefore more efficiently. The question at once presents itself whether the fostering of a contented mind on the part of an employee by legislation of this type, is in any just sense a regulation of interstate transportation. If that question be answered in the affirmative, obviously there is no limit to the field of so-called regulation. The catalogue of means and actions which might be imposed upon an employer in any business, tending to the satisfaction and comfort of his employees, seems endless. Provision for free medical attendance and nursing, for clothing, for food, for housing, for the education of children, and a hundred other matters, might with equal propriety be proposed as tending to relieve the employee of mental strain and worry. Can it fairly be said that the power of Congress to regulate interstate commerce extends to the prescription of any or all of these things? Is it not apparent that they are really and essentially related solely to the social welfare of the worker, and therefore remote from any regulation of commerce as such? We think the answer is plain. These matters obviously lie outside the orbit of congressional power. The answer of the petitioners is that not all such means of promoting contentment have such a close relation to interstate commerce as pensions. This is in truth no answer, for we must deal with the principle involved and not the means adopted. If contentment of the employee were an object for the attainment of which the regulatory power could be exerted, the courts could not question the wisdom of methods adopted for its advancement."

It is true that the Supreme Court has said that wherever the interstate and intrastate transactions of carriers are so related that effective control of the one requires control of the other, it is the Congress, and not the state, that may prescribe the final and dominant rule, because otherwise the nation would not be supreme in the national field. Minnesota Rate Cases, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A. (N.S.) 1151, Ann.Cas. 1916A, 18; Houston, E. W. T. R. Co. v. U. S. (The Shreveport Case), 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341; American Express Co. v. Caldwell, 244 U.S. 617, 37 S.Ct. 656, 61 L.Ed. 1352: Illinois Central R. Co. v. Public Utilities Comm., 245 U.S. 493, 38 S.Ct. 170, 62 L.Ed. 425; Railroad Commission of Wisconsin v. C. B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.L.R. 1086. In the Shreveport Case, the court said (234 U.S. 342, at pages 351–353, 34 S. Ct. 833, 836, 58 L.Ed. 1341): "Congress is empowered to regulate,—that is, to provide the law for the government of interstate commerce; to enact 'all appropriate legislation' for its 'protection and advancement' (The Daniel Ball, 10 Wall. 557, 564, 19 L. Ed. 999, 1001); to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U.S. 691, 696, 697, 26 L.Ed. 238–240); 'to foster, protect, control, and restrain' (Second Employers' Liability Cases, 223 U.S. 1, 47, 53, 54, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A. (N.S.) 44). Its authority, extending to these interstate carriers as instruments of interstate commerce, necessarily embraces the right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essen-

tial or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance. * * * The fact that carriers are instruments of intrastate commerce, as well as of interstate commerce, does not derogate from the complete and paramount authority of Congress over the latter, or preclude the Federal power from being exerted to prevent the intrastate operations of such carriers from being made a means of injury to that which has been confided to Federal care. Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority, and the state, and not the nation, would be supreme within the national field. * * * This is not to say that Congress possesses the authority to regulate the internal commerce of a state, as such, but that it does possess the power to foster and protect interstate commerce, and to take all measures necessary or appropriate to that end, although intrastate transactions of interstate carriers may thereby be controlled."

Likewise, in the Wisconsin Railroad Commission Case, the court said (257 U.S. 563, at pages 588–590, 42 S.Ct. 232, 237, 66 L.Ed. 371, 22 A.L.R. 1086): "It is objected here, as it was in the Shreveport Case, that orders of the Commission which raise the intrastate rates to a level of the interstate structure, violate the specific proviso of the original Interstate Commerce Act repeated in the amending acts, that the Commission is not to regulate traffic wholly within a state. To this, the same answer must be made as was made in the Shreveport Case, 234 U.S. 342, 358, 34 S.Ct. 833, 58 L.Ed. 1341, that such orders as to intrastate traffic are merely incidental to the regulation of interstate commerce and necessary to its efficiency. Effective control of the one must embrace some control over the other in view of the blending of both in actual operation. The same rails and the same cars carry both. The same men conduct them. Commerce is a unit and does not regard state lines, and while under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they

are so mingled together that the supreme authority, the Nation, cannot exercise complete effective control over interstate commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of state authority or a violation of the proviso. * * * Congress in its control of its interstate commerce system is seeking in the Transportation Act to make the system adequate to the needs of the country by securing for it a reasonable compensatory return for all the work it does. The states are seeking to use that same system for intrastate traffic. That entails large duties and expenditures on the interstate commerce system which may burden it unless compensation is received for the intrastate business reasonably proportionate to that for the interstate business. Congress as the dominant controller of interstate commerce may, therefore, restrain undue limitation of the earning power of the interstate commerce system in doing state work. The affirmative power of Congress in developing interstate commerce agencies is clear. Wilson v. Shaw, 204 U.S. 24, 27 S.Ct. 233, 51 L.Ed. 351; Luxton v. North River Bridge Co., 153 U.S. 525, 14 S.Ct. 891, 38 L.Ed. 808; California v. Central Pacific R. Co., 127 U.S. 1, 39, 8 S.Ct. 1073, 32 L.Ed. 150. In such development, it can impose any reasonable condition on a state's use of interstate carriers for intrastate commerce, it deems necessary or desirable. This is because of the supremacy of the national power in this field."

But there is only the remotest analogy between the situation in these cases, and the situation here presented, because *none* of the companies now before the court do an interstate business, and yet the Public Utility Holding Company Act purports to control *all* of their activities. "Interstate commerce is a practical conception and what falls within it must be determined upon consideration of established facts and known commercial methods." Public Utilities Commission v. Landon, 249 U.S. 236, 245, 39 S.Ct. 268, 269, 63 L. Ed. 577. Since, as has been frequently held, the local distribution of electric power and gas is not interstate commerce, even though delivered to the distributor as the result of interstate transmission [South Carolina Power Co. v. South Carolina Tax Commission (D.C.) 52 F.(2d) 515, affirmed 286 U.S. 525, 52 S.Ct. 494, 76 L. Ed. 1268; Id. (D.C.) 60 F.(2d) 528, affirmed Broad River Power Co. v. Query,

288 U.S. 178, 53 S.Ct. 326, 77 L.Ed. 685; East Ohio Gas Co. v. Tax Commission of Ohio, 283 U.S. 465, 51 S.Ct. 499, 75 L.Ed. 1171; Public Utilities Commission v. Landon, supra], there is no ground whatsoever for saying that the companies now before the court are engaged in any business that affects interstate commerce in the constitutional sense.

 The only possible connection with interstate commerce on the part of any of the companies here involved, after giving the greatest possible emphasis to the close relationship between parent company and subsidiary, is that the parent communicates with the subsidiary through use of the various instrumentalities of interstate commerce, and that both the parent and the subsidiary, individually, resort to these same mediums in the prosecution of their respective businesses, each and every one of which is intrastate in character. But we have just seen that such use of these mediums does not convert the business of the user into interstate commerce, or subject it or him to federal control. The argument that it does is purely one of supposed expediency—a question with which the courts are not concerned—namely, that a "national public interest" is involved because the public utility holding company "becomes an agency which, unless regulated, is injurious to investors, consumers, and the general public". (quoting from the preamble of the act itself 15 U.S.C.A. § 79a (c); that the several states are either impotent or unwilling to bring about effectual regulation; and that, therefore, the federal government must, of necessity, have the power to act for all. That the business of public utility companies is affected with a "public interest" is beyond dispute. Wolff Co. v. Industrial Relations Court, supra. Because this is so, such companies are subject to extensive regulation by the states in which they operate. But being affected with a "public interest" is not synonymous with being affected with a *national* public interest." The latter condition only exists under our Constitution so as to permit of federal regulation, when the person, company, or thing affected with a "public interest" is in fact involved directly, not indirectly, in activities over which the federal government, through one or more of the powers delegated to it by the Constitution, has jurisdiction.

Indeed, this argument of "national public interest," if permitted to prevail in the present case, might be advanced with far greater force with respect to most other great business activities, with the result that nothing would be left of state or local autonomy under the Constitution. The Tenth Amendment would become a myth. Consider the automobile, radio, and moving picture industries. The almost universal use of the automobile by every class of society for every type of human activity, bad as well as good; the constant, grave danger to life and limb inherent in such use; the fact that it has become the most sinister and elusive handmaid of crime—are all indisputable facts, calling, we will assume, for increased regulation in the "national public interest." But what agency may constitutionally do this regulating? Perhaps, because of the vast interstate character of the automobile's use, it may not be too far a cry from federal regulation of intrastate railroad rates where they directly impinge upon or burden interstate rates (The Shreveport Case and like decisions, supra), to federal limitation of the potential speed of *all* automobiles manufactured or sold, because capable of being used in interstate traffic, and such use having become virtually as inseparable, practically speaking, from their use in intrastate traffic, as the interstate railroad rate was found to be inseparable from the intrastate rate. But what would be the legitimate basis, if any, for such federal regulation? Clearly it must rest upon the basic fact that the thing regulated is actually engaged in interstate commerce, and not, as here, upon the merely incidental fact that the producer or seller, *incidentally* uses instrumentalities of interstate commerce in the prosecution of a business which in every other aspect is distinctly intrastate in character.

And similarly, with respect to radio and moving pictures. They are both subjects of congressional regulation because of the fact that, in the one case, the ether wave, and in the other, the moving picture film itself, is transmitted across state lines. See Federal Radio Commission v. Nelson Bros. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166; Weber v. Freed, 239 U.S. 325, 36 S.Ct. 131, 60 L.Ed. 308, Ann.Cas. 1916C, 317.

### INSEPARABLE CHARACTER OF THE PROVISIONS OF THE ACT.

Finally, we come to the question whether the Public Utility Holding Company Act must be declared invalid as a whole, because of its failure to distinguish between interstate and intrastate commerce, despite the

legislative declaration contained in it (section 32, 15 U.S.C.A. § 79z—6) that invalid provisions shall not operate to destroy the act as a whole.

 We find the act is inseparable in its provisions. There is no basis whatsoever for asserting that the Congress did not intend to make the act apply to *all* companies of the types enumerated, without preservation of the distinction between intrastate and interstate activities, which is indispensable in order to save the constitutionality of the act under the commerce clause. The fact that the preamble, or declaration of policy (section 1), may possibly be capable of a narrower construction, considered solely by itself, detached from the body of the act, is of no importance as we have seen, because only an expression which is completely rebutted by the act's provisions. In short, notwithstanding the presumption in favor of divisibility which arises from the legislative declaration contained in section 32 of the act, this court cannot rewrite a statute and give it an effect altogether different from that necessarily produced by its provisions, viewed as a whole. First Employers' Liability Cases, supra; Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822; Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596; Utah Power & Light Co., v. Pfost, supra; Railroad Retirement Board v. Alton R. Co., supra. Invalid parts of a law may be dropped only if what is retained is fully operative as a law. Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403. In the Public Utility Holding Company Act, invalid provisions are the rule rather than the exception. So devoid are its provisions of any attempt properly to distinguish between intrastate and interstate commerce that, were dissection attempted, scarcely a clause would survive, save perhaps the preamble.

THE ACT IN RELATION TO THE USE OF THE MAILS AND INSTRUMENTALITIES OF INTERSTATE COMMERCE.

We come now to the second argument advanced in support of the unconstitutionality of the act, namely, that the act excludes from the mails and the instrumentalities of interstate commerce, through arbitrary application of congressional power over the mails and these instrumentalities, things which Congress has no power to regulate.

A. USE OF THE INSTRUMENTALITIES OF INTERSTATE COMMERCE.

 It is to be noted that the argument is a twofold one, involving: (1) The mails, and (2) instrumentalities of interstate commerce. Were the argument addressed solely to the question of the broad exclusion, provided in the act, from use of instrumentalities of interstate commerce, it could, and should, be approved with but little discussion, by reliance upon decisions of the Supreme Court so clearly controlling of the question as to leave no room for controversy. We refer primarily to the so-called Child Labor Cases, the first one being Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas. 1918E, 724, where it was held that an employer of child labor could not be prohibited from shipping his harmless child-made products into other states; and the second one, Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432, where Congress was likewise forbidden to invoke the taxing power to accomplish the same ultimate end, namely, regulation of child labor within the states. In short, these cases decided that what cannot be done directly, because of constitutional restriction, may not be accomplished indirectly by legislation which accomplishes the same result, because constitutional provisions, whether operating by way of grant or limitation, are not to be evaded by legislation which, although not in terms trespassing upon the letter and spirit, yet in substance or effect destroys, the grant or limitation.

In the first of these Child Labor Cases, the court said (247 U.S. 251, at pages 273–276, 38 S.Ct. 529, 531, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas. 1918E, 724):

"It is further contended that the authority of Congress may be exerted to control interstate commerce in the shipment of child-made goods because of the effect of the circulation of such goods in other states where the evil of this class of labor has been recognized by local legislation, and the right to thus employ child labor has been more rigorously restrained than in the state of production. In other words, that the unfair competition, thus engendered, may be controlled by closing the channels of interstate commerce to manufacturers in those states where the local laws do not meet what Congress deems to be the more just standard of other states. * * *

"The grant of power to Congress over the subject of interstate commerce was to enable it to regulate such commerce, and not to give it authority to control the states in their exercise of the police power over local trade and manufacture.

"The grant of authority over a purely federal matter was not intended to destroy the local power always existing and carefully reserved to the states in the Tenth Amendment to the Constitution. * * *

"That there should be limitations upon the right to employ children in mines and factories in the interest of their own and the public welfare, all will admit. That such employment is generally deemed to require regulation is shown by the fact that the brief of counsel states that every state in the Union has a law upon the subject, limiting the right to thus employ children. In North Carolina, the state wherein is located the factory in which the employment was had in the present case, no child under twelve years of age is permitted to work.

"It may be desirable that such laws be uniform, but our federal government is one of enumerated powers; 'this principle,' declared Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, 'is universally admitted.' * * *

"In interpreting the Constitution it must never be forgotten that the nation is made up of states to which are entrusted the powers of local government. And to them and to the people the powers not expressly delegated to the national government are reserved. Lane County v. Oregon, 7 Wall. 71, 76, 19 L.Ed. 101. The power of the states to regulate their purely internal affairs by such laws as seem wise to the local authority is inherent and has never been surrendered to the general government. New York v. Miln, 11 Pet. 102, 139, 9 L.Ed. 648; Slaughter House Cases, 16 Wall. 36, 63, 21 L.Ed. 394; Kidd v. Pearson, supra. To sustain this statute would not be in our judgment a recognition of the lawful exertion of congressional authority over interstate commerce, but would sanction an invasion by the federal power of the control of a matter purely local in its character, and over which no authority has been delegated to Congress in conferring the power to regulate commerce among the states. * * *

"In our view the necessary effect of this act is, by means of a prohibition against the movement in interstate commerce of ordinary commercial commodities to regulate the hours of labor of children in factories and mines within the states, a purely state authority. Thus the act in a two-fold sense is repugnant to the Constitution. It not only transcends the authority delegated to Congress over commerce but also exerts a power as to a purely local matter to which the federal authority does not extend. The far reaching result of upholding the act cannot be more plainly indicated than by pointing out that if Congress can thus regulate matters entrusted to local authority by prohibition of the movement of commodities in interstate commerce, all freedom of commerce will be at an end, and the power of the states over local matters may be eliminated, and thus our system of government be practically destroyed."

Likewise, in the second Child Labor Case, the court said (259 U.S. 20, at pages 37–40, 42 S.Ct. 449, 450, 66 L.Ed. 817, 21 A.L.R. 1432):

"It is the high duty and function of this court in cases regularly brought to its bar to decline to recognize or enforce seeming laws of Congress, dealing with subjects not intrusted to Congress, but left or committed by the supreme law of the land to the control of the states. * * *

"Out of a proper respect for the acts of a co-ordinate branch of the government, this court has gone far to sustain taxing acts as such, even though there has been ground for suspecting, from the weight of the tax, it was intended to destroy its subject. But in the act before us the presumption of validity cannot prevail, because the proof of the contrary is found on the very face of its provisions. Grant the validity of this law, and all that Congress would need to do, hereafter, in seeking to take over to its control any one of the great number of subjects of public interest, jurisdiction of which the states have never parted with, and which are reserved to them by the Tenth Amendment, would be to enact a detailed measure of complete regulation of the subject and enforce it by a so-called tax upon departures from it. To give such magic to the word 'tax' would be to break down all constitutional limitation of the powers of Congress and completely wipe out the sovereignty of the states. * * *

"The analogy of the Dagenhart Case is clear. The congressional power over interstate commerce is, within its proper scope, just as complete and unlimited as the congressional power to tax, and the legislative motive in its exercise is just as free

from judicial suspicion and inquiry. Yet when Congress threatened to stop interstate commerce in ordinary and necessary commodities, unobjectionable as subjects of transportation, and to deny the same to the people of a state in order to coerce them into compliance with Congress' regulation of state concerns, the court said this was not in fact regulation of interstate commerce, but rather that of state concerns and was invalid. So here the so-called tax is a penalty to coerce people of a state to act as Congress wishes them to act in respect of a matter completely the business of the state government under the federal Constitution. This case requires as did the Dagenhart Case the application of the principle announced by Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 423 [433], 4 L.Ed. 579, in a much-quoted passage: 'Should Congress, in the execution of its powers, adopt measures which are prohibited by the Constitution; or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government; it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land.' "

That the principle of these cases is applicable to the Public Utility Holding Company Act is clear. After December 1, 1935, section 4 of the act denies to unregistered companies, which under section 2 (a) (7) are holding companies, the use of any instrumentality of interstate commerce to negotiate or perform service, sales, or construction contracts; to distribute or make any public offering for sale or exchange of any securities of any holding company, public utility, or affiliate; to acquire or negotiate for the acquisition of securities or utility assets of any subsidiary company or affiliate of such holding company, any public utility company, or any holding company. This section goes still further and makes it unlawful for any unregistered holding company to engage in any business in interstate commerce, or to own or control securities of a subsidiary which itself does any of these things. Similar prohibitions are imposed, as we have seen, by the act upon delinquent or nonconforming registered companies. In short, exclusion from the use of all instrumentalities of interstate commerce is one of the means relied upon to effectuate entire domination and control of registered and unregistered companies.

It is axiomatic that the power of Congress to regulate interstate commerce may include the power to prohibit, in certain cases, the movement of persons or things in interstate commerce. For example, Congress may lawfully forbid the interstate transportation of lottery tickets (Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492); of diseased livestock (Missouri, Kansas & Texas R. Co. v. Haber, 169 U.S. 613, 18 S.Ct. 488, 42 L.Ed. 878); of adulterated or misbranded foods (Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364; Weeks v. United States, 245 U.S. 618, 38 S.Ct. 219, 62 L.Ed. 513); of white slaves (Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A. (N.S.) 906, Ann.Cas. 1913E, 905; Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A. 1917F, 502, Ann.Cas. 1917B, 1168); of prize fight films (Weber v. Freed, 239 U.S. 325, 36 S.Ct. 131, 60 L.Ed. 308, Ann.Cas. 1916C, 317); of intoxicants outlawed by the state of destination (Clark Distilling Co. v. Western Maryland R. Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A. 1917B, 1218, Ann. Cas. 1917B, 845); and of stolen automobiles (Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407). But it is to be noted that in all of these cases the power of exclusion by Congress was upheld because the exclusion was addressed directly to the transportation of harmful persons or things, that is, to the harmful use of the instrumentalities of interstate commerce, public health, safety and morals being involved. The law that was upheld in each of these cases did not provide that the shipper of the harmful thing should be denied the right to use the facilities of commerce, except for the harmful purpose. The exclusion imposed by the Public Utility Holding Company Act is vastly broader and bears no relation necessarily to the *use* itself, but to the *user*. For example, as we have seen, the prohibition includes use of the instrumentalities of interstate commerce *in any form* in connection with service, sales, or construction contracts; with the distribution and acquisition of securities; and in fact, any unregistered holding company is forbidden to do anything whatsoever having the slightest connection with interstate commerce. Exclusion of this unlimited character is, as we have seen from the decisions of the Supreme Court, something which Congress may not put into effect with respect to individuals or corporations over

which it may have unquestioned regulatory power because of their admitted use, as a primary part of their business, of the instrumentalities of interstate commerce. A fortiori, such exclusion cannot be permitted when brought to bear upon individuals or corporations such as those here involved which, admittedly, are not engaged in any sense whatsoever in interstate commerce, but whose activities are sought to be abridged in this manner solely upon the theory that they are "affected with a national public interest."

### B. USE OF THE MAILS.

Turning now to the question of the right of Congress to exclude these companies from the use of the mails as it purports to do by the equally broad provisions of the Public Utility Holding Company Act, the argument is made that whatever may be said with respect to possible limitations upon the power of Congress to restrict the use of the instrumentalities of interstate commerce, the force of this reasoning disappears when we turn to a consideration of the mails, because the power of Congress over the mails is by the Constitution proprietary and absolute; that there can be no mail facilities except those which Congress itself creates and over which it has entire dominion; whereas interstate commerce exists as an inherent thing; it was not created by any power granted in the Constitution, and Congress is given power merely to regulate such commerce, albeit, in some instances, the power to regulate must, in the public interest, imply the power to prohibit or exclude.

A correct answer to this argument implies some consideration of the history of the postal power of Congress. This power flows from article 1, § 8, cl. 7 of the Constitution, whereby Congress is given power "to establish Post Offices and post Roads." The Federalist contains but a single reference to this power (The Federalist, No. 42). Likewise, there was little discussion or debate in the Constitutional Convention with respect to this clause, perhaps due to a fear, on the part of some at least, of appearing to give the central government too much power, and thus endangering the chances of adoption of the Constitution as a whole. See Farrand Records of the Federal Convention, vol. 1, p. 243; vol. 2, pp. 135, 177, 303, 324, 590, 615; vol. 3, pp. 604, 607.

In the early years of the government, the view was maintained by some that by this grant Congress was given merely the power to designate the routes over which the mails should be carried and the post offices where they should be received and distributed, and to exercise the necessary protection in relation thereto, and that it did not include the power to construct and operate agencies for the actual carrying and distribution of the mails. See President Monroe's Veto of the Cumberland Road Bill, May 4, 1822; "The Postal Power of Congress" by Lindsay Rogers; Studies in Historical and Political Science, vol. 34 (1916), Johns Hopkins University Studies. However, the rapid expansion of the mail service from the very creation of our government, and its ever-increasing importance in the everyday lives of our people, are common knowledge. Suffice it to say for the present inquiry that whereas the form of the original grant was merely to establish post offices and post roads, nevertheless, to create and regulate the entire postal system of the country has been declared by the Supreme Court to be the evident and necessary intent of this grant. That is, a power in Congress far beyond the limitations of a precise interpretation of the form of the grant has for many years been conceded. In other words, the Supreme Court has declared that the grant necessarily carried with it the right to exercise all power incident to making the grant effective. So Congress may exclude articles dangerous to mail employees or injurious to other mail matter, and may prevent the use of the mails for fraudulent purposes or in derogation of the public morals. See Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877; In re Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092. Similarly, privileges such as second-class mail rates may be granted to one class of mail matter and denied to another, and the special privilege so conferred may be conditioned or revoked for cause. Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190; United States ex rel. Milwaukee Publishing Co. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704. In all of these instances, however, the exclusion related directly to the matter itself sought to be transmitted by the mails, that is, to the *offending thing*. The Public Utility Holding Company Act, however, denies the right to use the mails to all companies or individuals that fall within its classifications when they fail to comply with any of the multifarious requirements of the act, *not, as we have seen, with respect merely to*

*matter, the transmission of which through the mails shall first have been found to be contrary to the public interest, but it excludes communications of every kind whatsoever indulged in by these companies or individuals,* without regard to the character of such communications, other than that they shall relate to the business of these companies or individuals, on the theory that they are "affected with a national public interest." We are thus brought face to face with the question whether Congress may, in the exercise of its postal power, thus arbitrarily exclude any and all matter from the mails even though harmless in character, as a means primarily of controlling the persons who would thus transmit the harmless things, and not the things themselves. This precise question appears never to have been presented to the Supreme Court for decision.

How far has Congress gone in the matter of exclusion which has been upheld as a valid exercise of the postal power? The following exclusions have been upheld: Lottery tickets and related matter (Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877; In re Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; Horner v. United States, 143 U.S. 570, 12 S.Ct. 522, 36 L.Ed. 266). Obscene matter (United States v. Chase, 135 U.S. 255, 10 S.Ct. 756, 34 L.Ed. 117; Grimm v. United States, 156 U.S. 604, 15 S.Ct. 470, 39 L.Ed. 550). Seditious matter (United States ex rel. Milwaukee Pub. Co. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704). Publications which fail to furnish information relative to ownership and circulation. (Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190). Fraudulent matter (Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092; Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706).

Thus it will be seen that exclusion has been upheld for the purpose of preventing use of the mails for an unlawful purpose, although Congress lacked the power to deal directly with the wrong involved. For example, it was said as early as 1877, in Ex parte Jackson, supra (96 U.S. 727, at page 732, 24 L.Ed. 877), where a law was upheld forbidding lottery circulars in the mails: "The right to designate what shall be carried necessarily involves the right to determine what shall be excluded. The difficulty attending the subject arises, not from the want of power in Congress to prescribe regulations as to what shall constitute mail matter, but from the necessity of enforcing

them consistently with rights reserved to the people, of far greater importance than the transportation of the mail."

Similarly, it was said in the case of In re Rapier, supra (143 U.S. 110, at page 134, 12 S.Ct. 374, 36 L.Ed. 93), which confirmed Ex parte Jackson, and upheld exclusion from the mails of newspapers containing lottery advertisements: "The states, before the Union was formed, could establish post-offices and post-roads, and in doing so could bring into play the police power in the protection of their citizens from the use of the means so provided for purposes supposed to exert a demoralizing influence upon the people. When the power to establish post-offices and post-roads was surrendered to the congress, it was as a complete power; and the grant carried with it the right to exercise all the powers which made that power effective. It is not necessary that congress should have the power to deal with crime or immorality within the states in order to maintain that it possesses the power to forbid the use of the mails in aid of the perpetration of crime or immorality."

But are there no limitations upon the right of Congress to determine what shall be excluded? May such right be exercised arbitrarily, in derogation of rights guaranteed by other parts of the Constitution? May Congress in fact indirectly, through its postal power, interfere at will with constitutional guaranties, when such interference would be prohibited if attempted directly? In spite of certain statements in some of the earlier decisions which, if isolated and considered apart from the precise facts and the ratio decidendi of the given case, may lend some little support to an affirmative answer to this question, we nevertheless believe that the law is otherwise. Obviously, the First Amendment, which guarantees freedom of speech and of the press, is not violated by exclusion from the mails of lottery tickets (Ex parte Jackson; In re Rapier, supra); nor of seditious matter (United States ex rel. Milwaukee Pub. Co. v. Burleson, supra); nor of publications which fail to furnish information relative to ownership and circulation (Lewis Publishing Co. v. Morgan, supra). Similarly, the guaranty of due process of law under the Fifth Amendment is not denied by excluding from the mails publications which do not comply with postal regulations requiring information as to ownership and circulation (Lewis Publishing Co. v. Morgan, supra); or seditious matter (United States ex rel. Milwaukee Pub. Co. v. Burleson, supra); or when let-

ters sent for illegal purposes are seized and returned to the sender, under postal regulations; or where the Postmaster General, in the exercise of authority vested in him by Congress, determines, on the basis of substantial evidence, upon exclusion of certain matter after due notice, and after a hearing had been afforded (Public Clearing House v. Coyne; United States ex rel. Milwaukee Pub. Co. v. Burleson, supra).

Has exclusion from the mails ever been upheld by the Supreme Court where the matter excluded was not, in and of itself, either (1) offensive or harmful to the public generally, or (2) not in compliance with postal regulations reasonably calculated to aid in the efficient maintenance and conduct of the mail service? Our investigations disclose no such decision. But, it is said, the Supreme Court has never been called upon directly to decide the question of how far exclusion may go. True, but the decisions very definitely support the conclusion here reached, to wit, that the exclusion must rest directly upon a regulation of the mails, that is, of the *use* of the mails —of the *thing* mailed—and not upon a regulation of the *user*. In Lewis Publishing Co. v. Morgan, supra, the court said (229 U.S. 288, at page 313, 33 S.Ct. 867, 874, 57 L.Ed. 1190); "That Congress, in exerting its power concerning the mails, has the comprehensive right to classify which it has exerted from the beginning, and therefore may exercise its discretion for the purpose of furthering the public welfare as it understands it, we think it too clear for anything but statement; the exertion of the power, of course, at all times and under all conditions, being subject to the express or necessarily implied limitations of the Constitution." In this case, the government had contended that the postal power "conveys an absolute right of legislative selection as to what shall be carried in the mails, and which therefore is not in any wise subject to judicial control, even although in a given case it may be manifest that a particular exclusion is but arbitrary, because resting on no discernible distinction, nor coming within any discoverable principle of justice or public policy." 229 U.S. 288, at page 300, 33 S.Ct. 867, 869, 57 L.Ed. 1190. To this the court, in closing its opinion rendered by Mr. Chief Justice White, made this emphatic reply (229 U.S. 288, at page 316, 33 S.Ct. 867, 876, 57 L.Ed. 1190); "Finally, because there has developed no necessity of passing on the question, we do not wish even by the remotest implication to be regarded as assenting to the broad contentions concerning the existence of arbitrary power through the classification of the mails, or by way of condition, embodied in the proposition of the government which we have previously stated."

In Ex parte Jackson, supra, it was definitely stated, and has never since been denied, that the exercise of the postal power by Congress could not contravene the guaranties of the First and the Fourth Amendments to the Constitution. There it was said (96 U.S. 727, at page 733, 24 L.Ed. 877);

"No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the fourth amendment of the Constitution.

"Nor can any regulations be enforced against the transportation of printed matter in the mail, which is open to examination, so as to interfere in any manner with the freedom of the press. Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value."

Similarly in the case of In re Rapier, supra, the limitations of the First Amendment were recognized as follows (143 U.S. 110, at pages 134, 135, 12 S.Ct. 374, 36 L. Ed. 93): "The circulation of newspapers is not prohibited, but the government declines itself to become an agent in the circulation of printed matter which it regards as injurious to the people. The freedom of communication is not abridged, within the intent and meaning of the constitutional provision, unless congress is absolutely destitute of any discretion as to what shall or shall not be carried in the mails, and compelled arbitrarily to assist in the dissemination of matters condemned by its judgment through the governmental agencies which it controls. That power may be abused furnishes no ground for a denial of its existence, if government is to be maintained at all."

Even if it be assumed that Congress may require registration of securities as a condition precedent to their passing through the mails—a point which we do not now attempt to decide, because not presented for decision (see Securities and Exchange Commission v. Jones, 12 F.Supp. 210, U.S. District

Court, S.D.N.Y., decided August 12, 1935, and Securities & Exchange Comm. v. Wickham, 12 F.Supp. 245, U.S. District Court, Minnesota, decided September 17, 1935)—it by no means follows that Congress may deny the use of the mails for other purposes to those failing so to register. The Public Utility Holding Company Act goes even further still. It does not make registration of *securities* with the commission the sine qua non of use of the mails, but registration of the specified *companies* or *individuals* who own or deal in the companies' securities; and as a penalty for failure so to register, they are deprived of the right to use the mails in negotiating or performing service, sales, or construction contracts for any public utility company or holding company; in distributing or making any public offering for sale or exchange of any of their own securities or those of their subsidiaries or affiliates, or of any other public utility companies or holding companies; or in acquiring any securities or utility assets of their subsidiaries or affiliates, or of any other public utility company or any holding company; and are forbidden to own or control any security of any subsidiary company that does any of these things.

Whether or not the right to send or receive matter through the mails actually owes its existence to the postal clause in the Constitution, it is certain that such a right would be a purely empty and abstract one were it not for the postal facilities supplied and maintained, by virtue of this clause, exclusively by the federal government. Nevertheless, this clause must be construed in the light of definite prohibitions in the Constitution. That is to say, "what cannot be done directly because of constitutional restriction cannot be accomplished indirectly by legislation which accomplishes the same result. * * * Or, in other words, constitutional provisions, whether operating by way of grant or limitation, are to be enforced according to their letter and spirit, and cannot be evaded by any legislation which, though not in terms trespassing on the letter, yet in substance and effect destroy the grant or limitation." Fairbank v. United States, 181 U.S. 283, 294, 300, 21 S. Ct. 648, 658, 45 L.Ed. 862. "If the means employed have no real substantial relation to public objects which government may legally accomplish,—if they are arbitrary and unreasonable, beyond the necessities of the case,—the judiciary will disregard mere forms and interfere for the protection of rights injuriously affected by such illegal action. The authority of the courts to interfere in such cases is beyond all doubt." Union Bridge Co. v. United States, 204 U. S. 364, 397, 27 S.Ct. 367, 378, 51 L.Ed. 523.

We will suppose a law which grants to the Postmaster General absolute authority arbitrarily to deny mail facilities to *all* matter—much of which we will assume to be admittedly innocuous—tendered for mailing by persons who, it will also be assumed, have sent other and admittedly objectionable matter through the mails. Such law would not comply with the due process guaranty of the Fifth Amendment. But by the Public Utility Holding Company Act, Congress seeks to do an even more arbitrary act—to close absolutely the use of the mails to a certain class of corporations and individuals if they refuse to comply with conditions which Congress has no power directly to impose, aiming by such exclusion to regulate certain practices of these corporations and individuals declared to be objectionable, although such practices are dissociated from much, if not indeed the greater portion, of the matter thus excluded and itself completely innocuous.

Such attempts at nullification by indirection are not new. The same thing was condemned in the First Employers' Liability Case, supra, and in both the first and second Child Labor Cases, supra. In the first Child Labor Case the question, succinctly stated, and which the Supreme Court answered in the negative, was this: May Congress, under the guise of regulating interstate commerce—a plenary power within its given sphere—prohibit transmission in interstate commerce of goods manufactured by child labor? Substitute for "interstate commerce," "the mails" (parcel post), and we have, in principle, the very question presented now, to which the same answer must be given, unless it be erroneously conceded that the power of Congress to exclude from the mails is absolutely without limitation; that upon the exercise of such power, there must disappear those reserved powers of the states guaranteed by the Tenth Amendment, and that due process of law guaranteed by the Fifth Amendment. If Congress may thus employ the postal power, why may not, for example, the power to control the nation's currency, and patents and copyrights—both of the same plenary character—be similarly employed, with the result that persons, when found to have of-

fended against this or that regulatory measure having no relation, however, to the use of money, or to "the progress of science and the useful arts," would be denied completely the right either to spend, or to save any money, or to enjoy the fruits of their inventive or artistic talents.

We are not dealing here with a mere question of legislative discretion. The facts are not debatable. If they were, it would not be permissible for this court to set up its opinion against the opinion of the lawmakers. Radice v. New York, 264 U.S. 292, 294, 44 S.Ct. 325, 68 L.Ed. 690; Stephenson v. Binford, 287 U.S. 251, 272, 53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721.

What has been said with respect to the inseparability of the multifarious provisions of the Public Utility Holding Company Act that bear generally upon the commerce clause, we find equally applicable to those that relate directly to the use of the mails and instrumentalities of interstate commerce. These reprisal provisions are so interwoven in the act as not only to render them incapable of separation, but also to leave no reasonable ground for assuming that Congress would have enacted the law without them.

THE ACT IN RELATION TO THE DUE PROCESS OF LAW CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION.

It is beyond question, and indeed conceded in this proceeding, that the power of Congress over interstate commerce and the mails are both subject to the limitations of the Fifth Amendment; but since we have found (1) that the Public Utility Holding Company Act is not a valid exercise of congressional power under the commerce clause, independently of any limitations imposed by the Fifth Amendment, and (2) that it is not a valid exercise of congressional power over the mails because in violation of the Fifth Amendment, it would be entirely unnecessary further to consider the act from the aspect of that amendment, were it not for the further claim that has been asserted on the part of the government that the act, in so far as the present petitioners, the trustees of the debtor corporation are concerned, is a valid exercise of congressional power over the subject of bankruptcies, and is not in derogation of the Fifth Amendment, because, as is asserted, Congress may enact any regulation for the administration of estates in bankruptcy in the federal courts that is not grossly arbitrary and unreasonable, and it is claimed the present act is not. This argument is, as we have already seen, completely refuted by the fact that the Public Utility Holding Company Act may not, for the purposes of one proceeding, be treated as a bankruptcy measure—when it clearly was never intended so to be —and for the purposes of another proceeding, be treated as something else, as expediency may dictate. Nevertheless, because of the extreme importance of the questions involved, we will consider the act's provisions in direct, specific relation to the due process clause of the Fifth Amendment, starting with the premise, which is irrefutable, that regardless of what the act be called, or what it aims to accomplish with relation to this or any other proceeding, it violates the Fifth Amendment if arbitrary, unreasonable, or capricious in its provisions.

Are the ends sought by the act legitimate? We have seen that the act not only is not limited by its express terms to the interstate commerce activities of holding companies, their subsidiaries and affiliates, but that by the breadth of its provisions virtually every function of these corporations and of their officers and directors are sought to be regulated—the corporate structures; all corporate business transactions; the rights of stockholders; the character of their borrowing and lending; their investments and expenditures; what may be sold and what may be acquired; the location and extent of their properties; the making of contracts; the methods of bookkeeping and of reporting; the qualifications of officers and directors. We have seen that the declaration in the preamble to the act, to the effect that holding companies are "affected with a national public interest," is in and of itself conclusive of nothing, because the validity of the act must be tested not by introductory statements of its *purported objects,* but by what its provisions *in fact embrace.* The government maintains that the facts as established in recent reports made by the Federal Trade Commission to the Senate and to the House of Representatives, which are matters of public record, furnish full justification for complete regulation— as companies affected with a national public interest—of holding companies which control and direct public utility operating companies. But we have already given sufficient consideration to this argument to show that it is of no force or effect if it runs counter to congressional power. Let us turn to a consideration of various provisions in the act, most of which, although heretofore analyzed in detail, have not been

interpreted with express relation to the Fifth Amendment.

■ First, with respect to the penalties for nonregistration. As we have seen, a non-registered holding company is prohibited from engaging in *any* business in interstate commerce, and it may not even own the stock or any security of any subsidiary company that does so. Hence, there is no reasonable relation between the alleged offense committed by the holding company and the penalty imposed upon it for the offense, because, presumably, the penalty applies even though much the greater portion of the penalized company's business in interstate commerce may be entirely remote from public utility business. Again, as we have seen, registration is required of every holding company which happens to have had outstanding on October 1, 1935, any security issued subsequent to January 1, 1925, and now held by any nonresident of the state of its corporate domicile. As was pointed out in argument, this is so broad as to mean that the last unredeemed bond of an earlier issue, the last share of preferred stock unretired, even an unpaid promissory note transmitted to a creditor by mail, will bring the act into operation if a nonresident holds it, although if the holder be a resident no such result will follow. We believe that these provisions of the law are unreasonable, arbitrary, and capricious.

■ Next, with respect to registration as it affects subsidiaries: Registration is the provision of the act which starts its entire machinery in motion. Upon registration, the holding company and every one of its subsidiaries can neither issue nor sell securities, sell or acquire property, declare dividends, perform service, sales, or construction contracts, borrow on their notes except in a very limited manner, nor engage with each other "in any transaction not otherwise unlawful," except with the approval of the commission. Any corporate stockholder who owns 10 per cent. or more of a company's voting securities, or who exercises a controlling influence over the management or policies of a subsidiary, thereby becomes a holding company subject to the control of the commission. In short, as was also pointed out in argument, even the involuntary act of a nonresident corporate stockholder, or even of a stranger in title, is sufficient to bring the subsidiary corporation under federal control; that is to say, a corporation not a subsidiary or under federal control to-day, might, through

no action of its own, become such to-morrow, merely because some person had purchased this very minor portion of its outstanding voting stock or had joined with others for the purpose of exercising a controlling influence on the subsidiary's management or policies. We believe that with respect to such inclusion of subsidiaries the act is likewise unreasonable, arbitrary, and capricious.

■ Again, with respect to the provisions of the act relating to the so-called simplification of holding company systems, we have seen that the commission is empowered to require, after January 1, 1938, every holding company and each of its subsidiaries (1) to divest itself of any interest in or control over property or persons to the extent that the commission may deem this necessary in order to limit operations to a "single integrated public utility system"; (2) to submit to reorganization or dissolution, should the commission find the corporate structure of the system "unduly or unnecessarily complicated," or that the voting power "is unfairly or inequitably distributed" among its security holders; and (3) to "cease to be a holding company with respect to each of its subsidiary companies which itself has a subsidiary company which is a holding company." Meanwhile, no acquisition of securities or assets in reorganization or otherwise can be approved which goes counter to the accomplishment of these objects.

Applying these requirements to the trustees in the present proceeding, they would be required to divest themselves of ownership or control over all subsidiaries except those located within a single area or region, either inter-connected or capable of physical inter-connection, which means that if the trustees retain the California subsidiaries, they must divest themselves of the Michigan subsidiaries, and vice versa. Indeed, the commission might even require that the Michigan subsidiaries be disposed of, since they might be deemed so large "as to impair (considering the state of the art and area or region affected) the advantages of localized management, efficient operation and effectiveness of regulation"; or that the corporate structure of the Michigan system was "unduly or unnecessarily" complicated, or that the voting power of the security holders of that system was "unfairly or inequitably" distributed. Finally, under section 11, the debtor corporation, or the American States Electric Company, would be required to be liquidated, because that company is a holding company of the

Hydro Power Company, which in turn is a holding company of the Grimes Pass Power Company. It is true that under this section the trustees might apply to the commission for an extension of time within which to liquidate, but they must first satisfy the commission that such is necessary, and even then the commission may not grant an extension for more than one year. It is, of course, also true that corporations or persons may be required to divest themselves of an interest in a competing corporation in order to prevent a violation of a federal law which prohibits direct interference with interstate commerce, as, for example, cases under the anti-trust laws. See The Northern Securities Case, and related decisions, supra. To the same effect are cases under the commodities clause of the Hepburn Act § 1, subd. 6 (49 U.S.C.A. § 1 (8). See United States v. Delaware & L. W. R. Co., and related decisions, supra. But in the situation before us, the subsidiaries of the debtor corporation are all located in different states, each doing a totally intrastate business; they do not compete with each other, and it is physically impossible for them to do so. We know of no instance where a court has upheld a congressional prohibition placed upon a private investor with respect to owning stock in two or more noncompetitive, disconnected, and dissociated companies, admittedly engaged in interstate commerce. Such a prohibition would be an abuse of congressional power. A fortiori, we have no hesitancy in concluding that the similar requirements, thus sought to be placed upon such persons or corporations as the trustees and the holding companies now before us, are unreasonable, arbitrary, and capricious.

Without reviewing the reasoning of the Supreme Court in the very recent case in which the first Frazier-Lemke Act (11 U.S. C.A. § 203 (s) was declared invalid, because violative of the due process of law clause of the Fifth Amendment (Louisville Joint Stock Land Bank v. Radford, supra) since we have heretofore alluded to it, suffice it to say that we believe that reasoning to be equally applicable to the present situation.

■ Next let us consider the restraints upon the acquisition of securities and utility assets and other interests. Sections 9 and 10 of the act (15 U.S.C.A. §§ 79i, 79j) prohibit the acquisition of interests in the future, unless approved by the commission, but such approval may only be granted if the acquisition is not unlawful under section 8, 15 U.S.C.A. § 79h (that is, does not

violate any applicable state law), and is not "detrimental" to carrying out the provisions of section 11, 15 U.S.C.A. § 79k, which we have just discussed; or unless the acquisition will serve the public interest by "tending towards the economical and efficient development of an integrated public utility system," as required by section 10. There are additional provisions relating to the broad discretionary power of the commission with respect to approving acquisitions, which are very inquisitorial in character, but which for immediate purposes it becomes unnecessary to analyze. In short, sections 9 and 10 of the act virtually destroy the private right of contract which is a part of the liberty of the individual protected by the due process clause of the Fifth Amendment. See Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238.

■ We now turn to the restraints imposed by the act upon the issuance of securities in sections 6 and 7, 15 U.S.C.A. §§ 79f, 79g. The first of these sections provides that it shall be unlawful for any registered holding company or a subsidiary (1) to issue or sell any security of such company, or (2) to exercise any privilege or right to alter priorities, privileges, voting power, or other rights of the holders of outstanding securities except in accordance with a declaration effective under section 7; and except that this prohibition shall not apply to a note or draft which is (1) not a part of a public offering; (2) matures within or is renewed for not more than nine months, and (3) aggregates not more than 5 per cent. of the other outstanding securities of the issuer. The sale of any holding company's security from house to house or by an officer or employee of any subsidiary of such holding company is prohibited. Turning to section 7, we find that approval for the issuance of a security shall not be given by the commission (subject to certain exceptions which are not relevant here) unless the security is (1) a par value common stock without preferences and with equal voting power, or (2) a bond secured by a first lien on physical property. Thus no par value stocks, preferred stocks, debentures, collateral trusts, and junior mortgages are forbidden. In short, the act purports to limit the power of the corporation to issue more than two classes of securities, and even these only when the commission, with virtually unlimited discretion, approves.

It is not an appropriate part of this opinion to discuss the relative merits of par val-

ue and no par value stock, or indeed the merits of, or possible need for, any of the limitations placed by the act upon the issuance of securities. We are here concerned only with the question of the power of Congress to impose such restraints. Is the exercise of such power unreasonable, arbitrary, and capricious? We believe that it is, for precisely the same reasons that we have found the other sections of the act just discussed to be unreasonable, arbitrary, and capricious. If these restraints be applicable to the debtor corporation, neither its reorganization plan, nor the so-called Swart reorganization plan, nor any other plan akin thereto, would be lawful although these plans provide for the issuance of securities, including debentures, which are not secured by the physical assets of the debtor or its subsidiaries; and, furthermore, in the debtor's plan, it is proposed that stock be issued in classes having unequal voting privileges. There is nothing inherently unreasonable or bad about such provisions, and yet they would be outlawed by the act.

■ We next turn to the provisions of the act (section 13, 15 U.S.C.A. § 79m) which seek to prohibit and regulate service, sales, and construction contracts. Likewise these provisions leave no reasonable discretion to the officers and directors of the corporations sought to be regulated and controlled with respect to their own business methods. After April 1, 1936, no registered holding company may take any step to perform any contract for services or construction work for, or sell goods to any associate, that is, "any company in the same holding company system," if such associate is a public utility or mutual service company; and after this same date, the same prohibition is placed upon the rendition by any subsidiary of a registered holding company of similar services for any associate except *at cost* and in accordance with such conditions as the commission may prescribe. Furthermore, the commission may prevent circumvention of its requirements by imposing similar restrictions upon affiliates, and upon persons whose principal business is the performance of service, sales, or construction contracts for public utility or holding companies.

As was appropriately said in argument by counsel for an intervening creditor, the definition of a "service contract" is so broad that even an accountant employed by a subsidiary, his principal business clearly being the performance of service for that company, would be in danger of being subjected to criminal penalties unless he pursued his employment in accordance with the rules and regulations prescribed by the commission; that, in short, the act prohibits any performance of service, sales, and construction contracts except by the particular persons and in the exact manner approved by the commission. Such is grossly in excess of any lawful congressional power.

Finally, the extreme of dictatorial control is to be found in section 12 of the act, 15 U.S.C.A. § 79*l*, which relates to intercompany loans, dividends, security transactions, sales of utility assets, proxies, and other transactions; and in section 17 of the act, 15 U.S.C.A. § 79q, relating to officers, directors, and other affiliates.

■ Section 12 makes it unlawful, save as the commission may permit, for a registered holding company to borrow money from, or to lend money or credit to, any public utility company in the same system or to declare any dividend, or acquire, retire, or redeem its own security, or to sell any security or utility asset of a public utility company which it owns. Furthermore, it makes it unlawful for any person to solicit any proxies in respect to any security of a registered holding company or subsidiary; and for any registered holding company or subsidiary to enter with another into *"any transaction not otherwise unlawful under the Act* [this chapter];" and for an affiliate to enter into the performance of any transaction with any company with which it is affiliated.

■ Section 17 places virtually under the entire control of the commission the regulation of the profits which an officer or director of a registered holding company or subsidiary may make by dealing in the stock of such company. It further requires that within one year no registered holding company or subsidiary shall have as its officer or director, a banker or a director or a representative of a bank, or of any corporation a majority of whose stock, having the unrestricted right to vote for the election of directors, is owned by a bank, except in such cases as the rules and regulations prescribed by the commission may permit as "not adversely affecting the public interest or the interest of investors or consumers."

■ Thus, to summarize, no function of management or control of the internal affairs of the holding companies or of the subsidiaries is left outside of the express scope of the act. If, as the Supreme Court has said, the public, acting through Congress, may not become "a general manager"

of the affairs of interstate carriers, a for-tiori, there is no basis whatsoever for usurpation by Congress of the functions of management of the internal affairs of pure-ly intrastate corporations such as those in the present proceeding, and which are un-questionably embraced within the express language of the act. See Interstate Com-merce Commission v. Chicago, Great West-ern R. Co., 209 U.S. 108, 28 S.Ct. 493, 52 L.Ed. 705. Compare Wilson v. New, 243 U.S. 332, 37 S.Ct. 298, 61 L.Ed. 755, L.R.A. 1917E, 938, Ann.Cas. 1918A, 1024.

What has previously been said with re-spect to the indivisibility of various other portions of the act applies with equal force to those provisions which have just been considered in relation to the Fifth Amend-ment.

■ Finally, it is believed that enough has been said to make it clear that this court is not to be controlled by other than strictly legal and constitutional questions. It is stated that this legislation "is not an exer-cise of political power for the purpose of augmenting the economic power of organ-ized industry. On the contrary, its purpose is to limit the concentration of power of economic enterprise in the public interest so that it will not menace the safety of the Nation. If government has not the power to curb the economic fascism and the private socialism of holding-company domination, the Federal Government would be without power to prevent the very dangers which de-mocracy which the Supreme Court feared lurked in the National Industrial Recovery Act (48 Stat. 195). The clearly expressed ultimate end of this legislation is to decen-tralize into separate regional organizations the few vast overconcentrated national or-ganizations which control our local power plants all over the country. It is a neces-sary exercise of political power on a na-tional scale to meet the strength and chal-lenge of the organization of economic power on a national scale." Congressional Record, 74th Congress, 1st Session, p. 8710, state-ment of Senator Wheeler. But, as has been explained at great length, every exercise of congressional power must find its justifica-tion in some authority delegated by the Con-stitution. If such authority is lacking, then it matters not how impotent or unwilling the states may be, or may appear to be, with respect to the accomplishment of desired ends. Congress may not interfere.

It is not to be assumed that the states are, in fact, without adequate power to remedy the evils that exist, any more than it is to be assumed that the entire public utility in-dustry is guilty of mismanagement or pred-atory practices; or that punishment for the sins of some should be visited upon all. But it may be conceded, as the framers and pro-ponents of the act assert, that there have been some serious abuses by public utility holding companies and, furthermore, that the debtor corporation in the present pro-ceeding is no exception. It may be conced-ed that the securities of such holding com-panies have often been issued and sold without the consent or approval of the states having jurisdiction over their subsidiaries; that such securities have often been issued on the basis of fictitious asset values and in anticipation of excessive revenues and paper profits at the expense of the underly-ing operating companies; that absence of adequate financial statements and account-ing has often concealed the insufficient equi-ty in such securities and has made it impos-sible for investors to obtain the information necessary for an adequate appraisal of the financial position of the companies involved, so that often such unsound capitalization of holding companies has operated to the detri-ment not only of widely scattered investors, but also of consumers of the utility prod-ucts of the underlying operating companies. Furthermore, it may be assumed that for the purpose of supporting such overcapita-lized security structures, these holding com-panies have often been under pressure to obtain the maximum possible revenue out of their subsidiary operating companies; that they have often resisted voluntary rate re-ductions which might strengthen their sub-sidiaries by increasing the consumption of gas and electricity; that they have often sought unfair and undisclosed profits through a great variety of inter-company transactions and have obstructed state reg-ulation through their control of the account-ing practices and financial policies of their subsidiary operating companies; that there has often been brought under common con-trol widely distant and unrelated utility fa-cilities in flagrant disregard of economic management and the integration and co-or-dination of properties; that such has tend-ed to concentrate control of the electric and gas operating industry in the hands of a few powerful groups having a relatively insignificant stake in their ownership; that such concentration of control has tended substantially to restrict competition in sup-plying the construction and other needs of the industry. Nevertheless, repeating and

summarizing what we have said, "a national public interest" only exists under the Constitution so as to permit of federal regulation when the person, company, or thing affected with a "public interest" is, in fact, involved directly, not indirectly, in activities over which the federal government, through one or more of the powers delegated to it by the Constitution, has jurisdiction.

In view of our conclusion whereby we find title 1 of the Public Utility Act of 1935, that is, the Public Utility Holding Company Act of 1935, void in its entirety because: First, not a valid exercise of congressional power under the commerce clause of the Constitution; second, not a valid exercise of the postal power by Congress under the Constitution; third, in violation of the due process of law clause of the Fifth Amendment; and, Fourth, the multifarious invalid provisions of the act are incapable of separation from other provisions possibly valid—it becomes unnecessary to consider the remaining question involving the constitutionality of the act which has been raised, namely, whether the act delegates to the Securities and Exchange Commission, without establishing adequate standards to guide its discretion, the legislative power to determine what the law shall be and when and to whom it shall apply, in violation of article 1, § 1, and article 1, § 8, cl. 18, of the Constitution.

It follows from the conclusions here reached that the trustees of the debtor corporation and the reorganization managers must treat the Public Utility Holding Company Act of 1935 as void and of no effect in their further administration of the affairs of the debtor corporation, pursuant to orders of this court heretofore or hereafter passed.